THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
JAMEL O. BECK, Defendant-Appellant.

Fifth District No. 5—87—0598

Opinion filed November 8, 1989.

750

Daniel M. Kirwan, Dan W. Evers, and John T. Hildebrand, all of State Appellate Defender's Office, of Mt. Vernon, for appellant.

John Baricevic, State's Attorney, of Belleville (Kenneth R. Boyle, Stephen E. Norris, and Gerry R. Arnold, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE HARRISON delivered the opinion of the court:

On November 25, 1986, Sergeant Lawrence Brewer of the East St. Louis police department filed a petition with the circuit court of St. Clair County pursuant to section 4—1 of the Juvenile Court Act (the Act) (Ill. Rev. Stat. 1985, ch. 37, par. 704—1), alleging that the defendant, Jamel O. Beck, born August 4, 1972, was delinquent and seeking to have him declared a ward of the court. The petition alleged that defendant, on November 22, 1986, committed six attempted murders, which are violations of section 8—4(a) of the Criminal Code of 1961 (the Code) (Ill. Rev. Stat. 1985, ch. 38, par. 8—4(a)), six aggravated batteries in violation of section 12—4(a) of the Code (Ill. Rev. Stat. 1985, ch. 38, par. 12—4(a)), and a home invasion in violation of section 12—11 of the Code (Ill. Rev. Stat. 1985, ch. 38, par. 12—11). The State subsequently petitioned under section 2—7(3) of the Act (Ill. Rev. Stat. 1985, ch. 37, par. 702—7(3)) to have the defendant prosecuted under the criminal laws of Illinois as an adult. After a transfer hearing on the State's motion on January 7 and 8, 1987, the court on February 6, 1987, ordered the defendant's case transferred for prosecution under the criminal laws.

On February 13, 1987, a grand jury indicted the defendant on six counts of armed violence in violation of section 33A—2 of the Criminal Code of 1961 (Ill. Rev. Stat. 1985, ch. 38, par. 33A—2), six counts of attempted murder, six counts of aggravated battery, and one count of home invasion. Subsequent to the indictment, plea negotiations commenced, and the defendant agreed to plead guilty to six counts each of armed violence and aggravated battery in return for the dismissal of the charges of attempted murder and home invasion. On June 10, 1987, the trial court accepted the pleas of guilty to the six armed violence and aggravated battery counts and entered judgments of conviction on those 12 counts. On July 27, 1987, the court sentenced the defendant to six consecutive terms of 20 years' imprisonment for the six armed violence convictions, for a total of 120 years' imprisonment. The court declined to sentence the defendant on the six aggravated battery convictions. The defendant appeals. We affirm in part and vacate in part.

On this appeal the defendant does not contest the charges or the evidence against him and raises no issue of reasonable doubt. Consequently, only those facts necessary to make clear the issues raised on this appeal will be found in this opinion. In his brief, the defendant contends that: (1) we must grant him a new transfer hearing because the lower court failed to comply with section 1—20 of the Act (Ill. Rev. Stat. 1985, ch. 37, par. 701—20), since at the defendant's first

appearance before the court, the court failed to explain the rights of the parties respondent as required by sections 1—20(1) and 1—20(3) of the Act; (2) we must grant the defendant a new transfer hearing because in applying section 2—7(3)(a) of the Act (Ill. Rev. Stat. 1985, ch. 37, par. 702—7(3)(a)), the court abused its discretion when it failed to properly consider and weigh the relevant statutory factors; (3) we must modify the defendant's consecutive sentences because section 5—8—4(c)(2) of the Unified Code of Corrections (Ill. Rev. Stat. 1985, ch. 38, par. 1005—8—4(c)(2)) excludes a juvenile from receiving consecutive sentences; (4) we must modify the defendant's consecutive sentences because, considering defendant's age and circumstances, incarceration totaling 120 years is not required to protect the public from further criminal conduct by the defendant and poorly serves the defendant's rehabilitative potential; and (5) we must vacate the defendant's convictions for aggravated battery because aggravated battery is an included offense of armed violence.

The defendant initially contends that we must grant him a new transfer hearing because the lower court failed to comply with section 1—20 of the Act (Ill. Rev. Stat. 1985, ch. 37, par. 701—20), since at the defendant's first appearance before the court, the court failed to explain the rights of the parties respondent as required by sections 1—20(1) and 1—20(3) of the Act. He alleges that the lower court failed to fulfil its mandatory duty to fully inform the defendant's parents that they had the right to have counsel appointed to represent them if they were financially unable to employ counsel; to inform them of the nature of the proceedings; and to inform them that they had the right to be present, be heard, present evidence material to the proceedings, cross-examine witnesses, and examine pertinent court files and records. The defendant failed to raise this issue before the lower court but requests that the review court consider this issue under the plain-error provision of Illinois Supreme Court Rule 615(a) (107 Ill. 2d R. 615(a)).

Section 1—20(1) of the Act provides that

"the minor who is the subject of the proceeding and his parents, guardian, legal custodian or responsible relative who are parties respondent have the right to be present, to be heard, to present evidence material to the proceedings, to cross-examine witnesses, to examine pertinent court files and records and also, although proceedings under this Act are not intended to be adversary in character, the right to be represented by counsel. At the request of any party financially unable to employ counsel, the court shall appoint the Public Defender or such

other counsel as the case may require." (Ill. Rev. Stat. 1985, ch. 37, par. 701—20(1).)

Section 1—20(3) of the Act provides that "[a]t the first appearance before the court by the minor, his parents, guardian, custodian or responsible relative, the court shall explain the nature of the proceedings and inform the parties of their rights under the first 2 paragraphs of this Section." Ill. Rev. Stat. 1985, ch. 37, par. 701—20(3).

■ We find that the lower court's error in this instance was harmless since the defendant failed to show how the court's admonishing his parents of their rights under section 1—20 of the Act would have changed the court's decision to order him prosecuted in an adult forum. The defendant's own attorney cross-examined the witnesses and elicited testimony from Dr. Daniel Cuneo, a clinical psychologist, in opposition to the State's motion to transfer. The defendant has failed to suggest what his parents could have added to this evidence that would have changed the result. Since the court's failure to comply with section 1—20 of the Act was harmless, and since the defendant failed to raise this issue at his hearing, we hold that he has waived this issue for purposes of this appeal.

The defendant's second contention on this appeal is that we must grant him a new transfer hearing because in applying section 2—7(3)(a) of the Act (Ill. Rev. Stat. 1985, ch. 37, par. 702—7(3)(a)), the juvenile court abused its discretion when it failed to properly consider the relevant statutory factors, and failed to properly weigh the evidence which reflected favorably upon the defendant. On February 6, 1987, the juvenile court filed an extensive ruling based on the six factors listed in section 2—7(3)(a) of the Act (Ill. Rev. Stat. 1985, ch. 37, par. 702—7(3)(a)). The defendant contends that a review of the record indicates that the lower court failed to adequately consider all the necessary statutory factors. The defendant also contends that, upon examination of the written order, it is apparent that the court ignored evidence that reflected favorably upon the defendant.

Section 2—7 of the Act (Ill. Rev. Stat. 1985, ch. 37, par. 702—7) prohibits criminal prosecution of minors who are under 17 years of age at the time of the alleged offense with certain exceptions. One of those exceptions, prescribed in section 2—7(3) of the Act, permits the prosecution of a minor at least 13 years of age for any offense if, upon the motion of the State's Attorney, a "Juvenile Judge, designated by the Chief Judge of the Circuit to hear and determine such motions," finds that it is not in the best interests of the minor or of the public to proceed under the Juvenile Court Act. Ill. Rev. Stat.

1985, ch. 37, par. 702—7(3).

■■■ Central to determining the legal adequacy of the defendant's transfer hearing is an understanding of the purpose and operation of section 2—7(3) of the Act. Section 2—7(3) was enacted subsequent to the United States Supreme Court's decision in *Kent v. United States* (1966), 383 U.S. 541, 16 L. Ed. 2d 84, 86 S. Ct. 1045, and closely parallels the District of Columbia's transfer provision as ruled upon in *Kent*. (See Ill. Ann. Stat., ch. 37, par. 702—7, Council Commentary, at 89 (Smith-Hurd Supp. 1989).) In *Kent*, the Supreme Court explained that the possibility of a minor being subjected to severe punishment is one of the reasons why a hearing, a statement of reasons, and the effective assistance of counsel are necessary before permitting criminal prosecution of the minor. (*Kent*, 383 U.S. at 553, 16 L. Ed. 2d at 93, 86 S. Ct. at 1053.) In *Kent*, as in the instant case, the issue was the legal adequacy of a transfer hearing to which the defendant was entitled by statute. In concluding that Kent's transfer hearing was inadequate as a matter of law, the Court stressed the critical function of such a hearing. "It is clear beyond dispute that the waiver of jurisdiction is a 'critically important' action determining vitally important statutory rights of [a] juvenile." (*Kent*, 383 U.S. at 556, 16 L. Ed. 2d at 94, 86 S. Ct. at 1055.) Because of the central significance of a transfer hearing, the Court observed that the juvenile court's discretion to waive jurisdiction must be exercised within the limits of due process and, in addition, must comport with applicable statutory guidelines. The Court then stated that the juvenile court must provide a statement of the reasons motivating the transfer:

> "Accordingly, we hold that it is incumbent upon the Juvenile Court to accompany its waiver order with a statement of the reasons or considerations therefor. We do not read the statute as requiring that this statement must be formal or that it should necessarily include conventional findings of fact. But the statement should be sufficient to demonstrate that the statutory requirement of 'full investigation' has been met; and that the question has received the careful consideration of the Juvenile Court; and it must set forth the basis for the order with sufficient specificity to permit meaningful review." (*Kent*, 383 U.S. at 561, 16 L. Ed. 2d at 97, 86 S. Ct. at 1057.)

As the Court phrased it, "the Juvenile Court should have considerable latitude within which to determine whether it should retain jurisdiction over a child or—subject to the statutory delimitation—should waive jurisdiction. But this latitude is not complete. At the outset, it assumes procedural regularity sufficient in the particular circum-

stances to satisfy the basic requirements of due process and fairness, as well as compliance with the statutory requirement of a 'full investigation.' " *Kent,* 383 U.S. at 552-53, 16 L. Ed. 2d at 92-93, 86 S. Ct. at 1053.

■■ ▌ The evolution of the present transfer provision from the Supreme Court's *Kent* decision, along with a careful analysis of section 2—7(3) of the Act, convinces us that the purpose of any transfer proceeding is to balance the best interests of the alleged juvenile offender, particularly as those interests relate to the potential for rehabilitation, against society's legitimate interest in being protected from criminal victimization perpetrated by minors. In striking this balance, the juvenile judge must weigh the facts of the alleged crime, particularly whether or not the alleged crime was committed in an "aggressive and premeditated manner," and decide if the facts as presented would support an indictment, must consider the age of the alleged offender and his previous history, ascertain the availability of treatment and rehabilitative services for the juvenile, and determine "whether the best interest of the minor and the security of the public may require that the minor continue in custody or under supervision for a period extending beyond his minority." (Ill. Rev. Stat. 1985, ch. 37, par. 702—7(3).) Finally, the judge weighing these relevant factors must determine whether to strike the balance for society by transferring the alleged juvenile offender, or to strike the balance for the juvenile by retaining jurisdiction. *People v. Clark* (1987), 119 Ill. 2d 1, 14, 518 N.E.2d 138, 143.

■■ ▌ In *People v. Taylor* (1979), 76 Ill. 2d 289, 305, 391 N.E.2d 366, 373, the Illinois Supreme Court held that in a transfer hearing, the court could make use of all documentary and testimonial evidence of a reliable nature even if hearsay. The State need only present evidence sufficient to persuade the trial court, in the sound exercise of its discretion, that in light of the statutorily prescribed criteria transfer is warranted. (*Taylor,* 76 Ill. 2d at 303-04, 391 N.E.2d at 372.) The role of the appellate court is to determine whether, in evaluating the evidence in the light of the statutory criteria, the juvenile judge has abused his discretion. (*Taylor,* 76 Ill. 2d at 300-01, 391 N.E.2d at 371.) After a thorough examination of the record in the instant case, reviewed in the light of the statutory language and the purpose of the transfer provision, we are unable to conclude that the juvenile judge abused his discretion in ordering the transfer of this defendant.

■ In compliance with section 2—7(3)(a) of the Act, the court must consider six factors in deciding whether to transfer a case: (1) whether there is sufficient evidence upon which a grand jury may be

expected to return an indictment; (2) whether there is evidence that the alleged offense was committed in an aggressive and premeditated manner; (3) the age of the minor; (4) the previous history of the minor; (5) whether there are facilities particularly available to the juvenile court for the treatment and rehabilitation of the minor; and (6) whether the best interests of the minor and the security of the public may require that the minor continue in custody or under supervision for a period extending beyond his minority. (Ill. Rev. Stat. 1985, ch. 37, par. 702—7(3)(a).) The juvenile court need make no formal statement of reasons or conventional findings of fact so long as the record is sufficiently explicit that the reviewing court may meaningfully review the lower court's exercise of its discretion. *People v. Taylor* (1979), 76 Ill. 2d 289, 301, 391 N.E.2d 366, 371.

■■ We initially note that sufficient evidence was introduced at the transfer hearing upon which a grand jury could be expected to return an indictment. The State presented uncontested evidence at the hearing that on November 22, 1986, at approximately 7 p.m., the defendant and his 19-year-old brother Steven Beck shot or knifed six children at the home of the Wilbourn family on 11th Street in East St. Louis.

Sergeant Lawrence Brewer of the East St. Louis police department was the initial witness at that hearing. Brewer testified regarding statements made by several individuals to him concerning the events of November 22, 1986. Brewer initially recounted defendant's version of the events given immediately after defendant's arrest on the morning after the shootings. According to the defendant, a friend named Brian Parnell had suggested to the defendant and to the defendant's brother that they could obtain some guns at the Wilbourn home. According to this account, the defendant, his brother Steven, and Parnell entered the Wilbourn residence through the front door. Erik Wilbourn met them and asked what they were doing. Parnell and Steven Beck then took Dianna Wilbourn downstairs, and Steven slit Dianna's throat. Dianna fell to the floor, and the defendant, the defendant's brother, and Parnell all believed that she was dead. The assailants decided at that point not to leave any witnesses. After locating the guns, Parnell and the defendant's brother ordered the children to lie on the bed. The defendant handed the guns to his brother and Parnell. Steven Beck and Parnell then started shooting the Wilbourn children. After the shootings began, Parnell handed one of the guns to the defendant, who shot Erik Wilbourn twice. The three assailants finally fled the house.

Brewer testified that he subsequently interviewed Brian Parnell,

who denied entering the Wilbourn home with the Becks on the evening of the shootings. The Wilbourn children and Steven Beck subsequently verified that Parnell was not a participant in these offenses.

Brewer next testified to statements made by the defendant's brother, Steven Beck. Steven essentially corroborated the defendant's account of the shootings—omitting, however, any mention of participation by Brian Parnell.

Brewer then testified to statements made by Dianna Wilbourn. According to this account of the shootings, on the evening of November 22, 1986, Dianna heard a noise in the basement and decided to investigate. Once in the basement, Dianna met Steven Beck and the defendant, who apparently had gained entry through a basement coal chute. Steven demanded oral sex from Dianna, and she refused. Steven then brandished a steak knife and slit Dianna's throat. Dianna's brother Erik heard Dianna's cries of pain, ran downstairs and was confronted by the defendant, who warned him not to proceed any farther. The defendant and his brother subsequently escorted Dianna upstairs, where she fainted and fell on the floor as though she had died from the throat slashing. Dianna heard the assailants discussing shooting her brothers and sisters so as not to leave any witnesses. Finally, before fleeing through the basement window to a neighbor's house, Dianna heard shots ringing through the house.

Erik Wilbourn's statements to Brewer essentially corroborated his sister Dianna's statements. According to Erik, after the defendant and his brother Steven entered the Wilbourn home, slit Dianna's throat, and demanded guns, Erik directed them to the guns in the home, which included a rifle, a .22 caliber revolver, a .32 caliber revolver, and a .38 caliber derringer. The defendant told Erik that the children—including the two youngest, Terry, a six-week-old baby, and DeMond, a three-year-old child—would have to be shot in order not to leave any witnesses. Erik begged the defendant not to kill the two youngest children. The defendant and his brother Steven ordered the five older children—Erik, 14 years old; John Lee, 7; Jonta, 6; Melissa, 5; and Emmanueal, 4—to lie across the bed. The Becks then fired their guns repeatedly into the children, with the defendant firing the majority of the shots.

The second factor that the juvenile court must consider in determining whether to transfer a minor defendant is whether the evidence suggests that the alleged offenses were committed in an aggressive and premeditated manner. The record here contains abundant evidence that these offenses were. By the time the defendant and his brother Steven ordered the victims into the bedroom, it

was clear that the Beck brothers had formed the intent to kill the children so as not to leave any witnesses to the slashing of Dianna Wilbourn's throat. The defendant and his brother certainly did not accidentally or unintentionally shoot the children, nor shoot them in a blind rage, as a finding of a *lack* of premeditation would suggest.

The third factor that the juvenile court must consider in deciding whether to transfer a defendant to an adult prosecutorial forum is the age of the minor. The defendant was 14 years old when he committed these offenses. In *People v. Taylor* (1983), 113 Ill. App. 3d 467, 474, 447 N.E.2d 519, 524, *aff'd as modified* (1984), 101 Ill. 2d 377, 462 N.E.2d 478, the defendant, charged with murder and armed robbery, was 13 years old at the time of the offenses. The juvenile court ordered the defendant's case transferred to an adult forum, and both the appellate court and the Illinois Supreme Court upheld that order. In *People v. M.D.* (1984), 101 Ill. 2d 73, 85-86, 461 N.E.2d 367, 373, a case involving a 15-year-old defendant, the Illinois Supreme Court found that the underlying facts presented at the transfer hearing led to the conclusion that the defendant, despite his youth, was not a stranger to adult experiences, and that this factor, weighed with the other relevant factors, necessitated the transfer of the case to an adult forum.

In the instant case, Sergeant Gregory Cox, an officer with the East St. Louis police department's juvenile division, testified at the transfer hearing that he had known the defendant since 1982-83, when the defendant was 11 years old. Cox believed the defendant to be a leader, to be "very mature streetwise," and to be a person who knew what he was doing. Ed Brown, a neighbor who had provided work for the defendant at Brown's home, testified at the hearing that the defendant was "very mature." Gerald Nave, the defendant's American History teacher at Rock Junior High School, testified that the defendant was very respectful and very mature. Dr. Daniel Cuneo, a clinical psychologist, met with the defendant twice and testified that the defendant knew that his actions in the charged offenses were wrong. The defendant expressed no regret or remorse to Dr. Cuneo for his actions, although he did regret that he had been caught.

The fourth statutory factor that the court must consider in determining whether to transfer a case is the previous history of the minor. In the instant case, according to the testimony of Officer Cox, the defendant had numerous contacts with the police, including having once been placed on a period of supervision for theft. Several of the incidents involving the defendant were apparently classified as "station adjustments," or verbal warnings from the police, which re-

viewing courts have held are relevant considerations at a transfer hearing. (*People v. Newell* (1985), 135 Ill. App. 3d 417, 421, 481 N.E.2d 1238, 1243.) In *Taylor*, 113 Ill. App. 3d at 478, 447 N.E.2d at 526, the defendant had *no* prior police involvement, yet the reviewing court held that the juvenile court had not abused its discretion when it ordered the defendant tried under the criminal laws. Here, however, the defendant had a fairly significant prior criminal history. Officer Cox testified that he first had contact with the defendant when some school children reported that the defendant had bullets in his possession and had threatened them. Cox subsequently handled other cases involving the defendant. In one instance, the defendant allegedly stole a gun from his grandfather, but the grandfather refused to prosecute. In another instance, the defendant was placed on supervision for the theft of a bicycle in Cahokia, Illinois.

The fifth factor that the juvenile court must consider in determining whether to transfer a defendant is whether there are facilities particularly available to the juvenile court for treatment and rehabilitation of the minor. When asked what type of treatment would be necessary considering his diagnosis of the defendant, Dr. Daniel Cuneo responded that the defendant would need a very structured and secure environment in which he could receive treatment for conduct disorders. According to Dr. Cuneo, without treatment "it's a foregone conclusion that you're going to have an individual who will be violent again." Dr. Cuneo testified that the defendant would need residential treatment for at least one year, stated that "violence starts to go off—[i]f we're just going to go straight age and straight stats, about the late '20's," and stated that "[v]iolence usually occurs in that period of time from about sixteen till about 22, 23. That's usually your peak period of violence for individuals, and if you look at your violent crimes, that's a majority—that's the age group that most violent crimes occur in." Elridge Cavett, a district patrol supervisor for the Illinois Department of Corrections, Juvenile Division, testified at the hearing that a juvenile charged with the defendant's crimes would probably be committed as a delinquent for approximately 20 months. Cavett also stated, however, that if the defendant were transferred to an adult prosecutorial forum, and if he were convicted and sentenced, the Department of Corrections would place the defendant in one of the most secure youth centers where he would remain—barring an early transfer to the adult division of the Department of Corrections—until his twenty-first birthday, and on that twenty-first birthday, defendant would automatically be transferred to the adult division to complete his remaining sentence. Thus, while

the record fails to indicate that the juvenile court could place this defendant in a suitable residence for an appropriate period of time, the record does indicate that defendant would receive a structured and secure environment through the Department of Corrections if transferred to an adult prosecutorial forum.

The sixth factor that the juvenile court must consider in determining whether to transfer a minor defendant is whether the best interests of the minor and the security of the public may require that the minor continue in custody or under supervision for a period extending beyond his minority. In *People v. M. D.* (1984), 101 Ill. 2d 73, 461 N.E.2d 367, a 15-year-old defendant shot and killed two victims as revenge for an earlier beating he had received from one of them. The juvenile court denied the State's motion to prosecute the defendant under the criminal laws, and the appellate court affirmed that determination. The Illinois Supreme Court, however, held that the juvenile court had abused its discretion by refusing to order the transfer. The defendant in *M.D.* was described as a person of lower than normal intelligence who was dangerous. A psychiatrist who examined the defendant stated that the defendant would cause more trouble if released. (*M.D.*, 101 Ill. 2d at 87, 461 N.E.2d at 374.) In reversing the juvenile court's order, the supreme court stated that "lack of intelligence and immaturity of personality in the commission of such a heinous crime does not entitle the respondent to the extraordinary protection and consideration of the juvenile court system." *M.D.*, 101 Ill. 2d at 88, 461 N.E.2d at 374.

In the instant case, Dr. Cuneo testified that he could not say how many years of treatment would be required to ensure that defendant would not commit further acts of violence. It is also noteworthy that Dr. Cuneo testified that the peak tendency toward violence usually occurs between the ages of 16 and 22, at which point the tendency towards violence begins to decrease. It is clear from Dr. Cuneo's testimony that unless this defendant successfully receives treatment, he is almost certain to commit other acts of violence. Elridge Cavett, a supervisor with the Illinois Department of Corrections, testified that under the docketing system presently used by the Juvenile Division of the Department of Corrections, the defendant could be given an administrative review date of approximately 20 months, although the period could be shorter or longer. Given the defendant's clear need for treatment, the uncertainty as to the length of time treatment may be required, and the almost certain recurrence of violence if treatment is not successful, it is clear that the best interests of the minor and the security of the public require that the defendant con-

tinue in custody or under supervision for a period extending beyond his minority.

Taken individually and collectively, the six statutory factors prescribed by section 2—7(3)(a) of the Act (Ill. Rev. Stat. 1985, ch. 37, par. 702—7(3)(a)) all weigh heavily in favor of the court's determination to transfer this defendant to an adult prosecutorial forum. As his final argument concerning the transfer hearing, the defendant urges that this court hold that, since the defendant was apparently eligible for a sentence of 120 years' imprisonment, the potential severity of that sentence required that the juvenile court determine whether a sentence of imprisonment of 120 years was in the defendant's best interests or was necessary for the public security. The defendant relies upon *People v. Clark* (1987), 119 Ill. 2d 1, 518 N.E.2d 138, for this position.

*Clark* is inapposite. In *Clark*, the defendant was charged with the murder of two people. That fact statutorily mandated the imposition of a sentence of imprisonment for the defendant's natural life if he were convicted under the criminal laws. Yet neither the juvenile court, the prosecutor, nor the defendant's own attorney apparently realized the consequence of allowing the State's motion to prosecute the defendant under the criminal laws. The Illinois Supreme Court thus remanded the cause for rehearing on the issue of the transfer, reasoning that "where, as here, the choice is between two extremes, incarceration to age 21 under the Act or incarceration for life without possibility of parole under the Criminal Code, adequate balancing calls for consideration of which penalty would best serve both of the interests at stake." *Clark*, 119 Ill. 2d at 15, 518 N.E.2d at 144.

In the case at bar, the crimes with which the defendant was charged did not mandate the imposition of a sentence of imprisonment for defendant's natural life. The lower court must have been aware that the offenses with which the defendant was charged were serious and could result in a lengthy sentence of imprisonment if the defendant were convicted. The court apparently weighed this factor, along with the other factors, in its determination of whether to transfer this defendant.

■■ In conclusion, we hold that the lower court did not err when it transferred the defendant's cause out of juvenile court. The court wisely recognized that it was necessary to retain control of this defendant beyond the time limits of the Juvenile Court Act. The offenses charged against the defendant—the shooting or stabbing of six children—were particularly heinous, and the testimony revealed that to have turned this defendant loose after 20 months within the juve-

nile correctional system would be to discharge a dangerous person who would present a severe hazard to society. Since our examination of the record fails to reveal an abuse of the lower court's discretion, we affirm the court's judgment on this issue.

The defendant's third contention on this appeal is that we must modify his consecutive sentences to run concurrently because section 5—8—4(c)(2) of the Unified Code of Corrections (Ill. Rev. Stat. 1985, ch. 38, par. 1005—8—4(c)(2)) excludes a juvenile from receiving consecutive sentences. This defendant was 14 years old on the date these offenses were committed and therefore could not be sentenced to an extended-term sentence. (Ill. Rev. Stat. 1985, ch. 38, par. 1005—5—3.2(b).) When consecutive sentences are imposed, section 5—8—4(c)(2) of the Unified Code of Corrections provides that the aggregate maximum of the consecutive sentences "shall not exceed the sum of the maximum terms authorized under section 5—8—2 for the 2 most serious felonies involved." (Ill. Rev. Stat. 1985, ch. 38, par. 1005—8—4(c)(2).) Section 5—8—2 of the Unified Code of Corrections is the extended-term provision, and the defendant alleges that this section mandates, through section 5—5—3.2(b), that the offender must be at least 17 years old on the date the crime was committed to be eligible for an extended-term sentence. Ill. Rev. Stat. 1985, ch. 38, par. 1005—5—3.2(b).

The circuit court, when confronted with this issue, stated that

"[t]he legal question raised by counsel is an interesting one. The question is what is the maximum number of years to which this defendant could be sentenced if the Court elects to impose consecutive sentences. I would agree with defense counsel that the defendant is not eligible for an extended term because of his age. However, that does not resolve the [consecutive-sentence] question. The Statute provides that prior to February 1, [1978,] the aggregate maximum of consecutive sentences could not exceed the maximum term of thirty years for each of the two most serious felonies. After that date, it's clear the Legislature intended to change that so that the aggregate of consecutive sentences could not exceed an extended term for the two most serious felonies involved. Obviously, they did not contemplate the present situation. Literally, it would seem that neither passage is applicable. And if that's the case, then there is no cap on the aggregate. Obviously, I don't think the Legislature intended for such a consequence. While the Court will not impose an extended term, the Court will use the standard suggested by the Legislature in [section

5—8—4(c)(2)]. The Court concludes that is the most probable intention of the Legislature."

The circuit court, in applying section 5—8—4(c)(2) of the Unified Code of Corrections, determined that the two most serious offenses involved were Class X felonies, and that under the extended-term provision the maximum sentence was 60 years for each Class X felony. The circuit court then reasoned that the maximum term permitted under section 5—8—2 for the two most serious felonies in this case was 120 years. The circuit court then imposed the maximum by sentencing the defendant to six consecutive 20-year terms for the six counts of armed violence, for a total sentence of imprisonment of 120 years.

 We are unable to hold that the trial court erred when it determined that section 5—8—4(c)(2) of the Unified Code of Corrections authorized it to sentence this defendant to consecutive sentences so long as the aggregate of the consecutive sentences did not exceed 120 years. In *People v. Woods* (1985), 131 Ill. App. 3d 51, 475 N.E.2d 589, the defendant pled guilty to seven Class X and four Class 1 offenses charged in three separate informations. The trial court ordered the sentences imposed on each of the charges in the three separate informations to run consecutively to the sentences imposed for the offenses charged in the two remaining informations. The aggregate of the consecutive sentences was 76 years. On appeal, the defendant contended that the aggregate of the consecutive sentences could not exceed 60 years because the extended-term sentences authorized by section 5—8—2 could not be used to compute the aggregate of the consecutive sentences allowed by section 5—8—4(c)(2) since the defendant was not eligible for an extended term. The appellate court rejected the defendant's argument, noting that "[i]n our judgment defendant has misread section 5—8—4(c)(2), which refers to section 5—8—2 only as a measuring statute. Defendant need not meet the separate qualifications for an extended-term sentence." *Woods*, 131 Ill. App. 3d at 54-55, 475 N.E.2d at 592.

In the instant case, as in *Woods*, the defendant has failed to cite authority supporting his argument that, since he is not eligible for an extended-term sentence, the sentencing court could not use the term set forth in the extended-term statute to calculate the aggregate of the consecutive sentences the court could impose. The eligibility requirements for consecutive sentences are stated in the consecutive sentence statute—section 5—8—4 of the Unified Code of Corrections—not in the extended-term statute—section 5—8—2 of the Unified Code of Corrections—and nothing in section 5—8—4 precludes

the imposition of consecutive sentences on offenders under the age of 17. *Woods* is persuasive authority for our conclusion that the extended-term statute serves the purpose of a measuring statute for the consecutive sentence statute. Since the consecutive sentence statute reveals no ambiguity regarding the qualifications for consecutive sentences, it is unnecessary to address the defendant's contention that we must construe section 5—8—4(c)(2) strictly in his favor.

The defendant's fourth contention on this appeal is that his sentence must be modified because, considering his age and circumstances, a sentence of 120 years' imprisonment is not required to protect the public from his further criminal conduct and poorly serves his rehabilitative potential. The core issue here is whether a 14-year-old should serve a term of imprisonment totalling 120 years. We find no basis for holding that he should not.

■■ ■ Unquestionably, the imposition of a consecutive sentence totalling 120 years' imprisonment on any person is a matter which requires careful consideration on review. Section 5—8—4(b) of the Unified Code of Corrections provides that "[t]he court shall not impose a consecutive sentence unless, having regard to the nature and circumstances of the offense and the history and character of the defendant, it is of the opinion that such a term is required to protect the public from further criminal conduct by the defendant, the basis for which the court shall set forth in the record." (Ill. Rev. Stat. 1985, ch. 38, par. 1005—8—4(b).) It is generally within the trial court's discretion to determine whether multiple terms of imprisonment are to be served concurrently or consecutively. (*People v. Peebles* (1984), 125 Ill. App. 3d 213, 223, 465 N.E.2d 539, 546.) The standard of review of a sentence claimed to be excessive is whether in fact the trial court exercised its discretion and, if so, whether this discretion was abused. (*People v. Cox* (1980), 82 Ill. 2d 268, 275, 412 N.E.2d 541, 545.) In *People v. Perruquet* (1977), 68 Ill. 2d 149, 154, 368 N.E.2d 882, 884, the Illinois Supreme Court stated that

> "the trial judge is normally in a better position to determine the punishment to be imposed than the courts of review. [Citations.] A reasoned judgment as to the proper sentence to be imposed *** depends upon many factors, including the defendant's credibility, demeanor, general moral character, mentality, social environment, habits, and age. [Citation.] The trial judge, in the course of the trial and the sentencing hearing, has an opportunity to consider these factors which is superior to that afforded by the cold record in this court."

In *People v. Generally* (1988), 170 Ill. App. 3d 668, 677, 525 N.E.2d

106, 111, this court noted that the imposition of punishment is one of the most important and sensitive of judicial responsibilities, and the reviewing court must give great weight to the sentence that the trial court imposes. The *Generally* court quoted with approval the statement by the court in *People v. West* (1977), 54 Ill. App. 3d 903, 909, 370 N.E.2d 265, 270, that

> "[t]he day is long past when this court, or any court, should quiver like a pole-axed blancmange at the mention of youth and rehabilitation. These are proper considerations in the fixing of sentences, but they are not the sole elements. The nature of the crime, the protection of the public, deterrence and punishment have equal status in the consideration."

■■■ It is uncontested on this appeal that the defendant, with his brother Steven, on the evening of November 22, 1986, in a calculated effort to avoid punishment for breaking into a home and slitting the throat of a 12-year-old girl, herded the five Wilbourn children into a bedroom and shot each of them. These acts clearly reveal a callous disregard for human life. Due only to the defendant's poor aim, and to the skills of the medical professionals, did the children survive this cruel and heinous ordeal.

The defendant emphasizes Dr. Daniel Cuneo's testimony at the transfer hearing that the defendant had the functioning mentality of a 10-year-old child. Other testimony at that hearing, however, indicates that rather than functioning at the equivalent of a 10-year-old, defendant's mind in many ways possessed remarkable maturity. As previously noted, Sergeant Cox, an officer in the juvenile division who had known the defendant for several years, testified that the defendant was "very mature streetwise," that he was a leader rather than a follower, and that he dominated others. Gerald Nave, the defendant's American History teacher at Rock Junior High School, considered defendant his favorite student, believed the defendant to be very mature, and gave the defendant an "A" in the class. The principal of the junior high school testified that the defendant received average grades in his other classes, and that he scored above average on most sections of the California Achievement Test, which tested defendant's skills in reading, language, arts, mathematics and social studies.

In essence, the defendant argues that he is entitled to a reduced sentence since he was only 14 years old when he attempted to eliminate the five Wilbourn children as witnesses. However, in light of the number and the seriousness of the criminal offenses to which the defendant pled guilty, we are unable to hold that the imposition of

consecutive sentences totaling 120 years constituted an abuse of the sentencing court's discretion. Since the record fails to indicate that the lower court erred, we affirm the sentences imposed by that court.

The defendant's final contention on this appeal is that we must vacate his six aggravated battery convictions since aggravated battery is a lesser included offense to armed violence. In *People v. Donaldson* (1982), 91 Ill. 2d 164, 170, 535 N.E.2d 477, 479, the Illinois Supreme Court held that multiple convictions for both armed violence and for the underlying felony of aggravated battery causing great bodily harm cannot stand when a single physical act is the basis for both offenses. Here, the trial court sentenced the defendant only for the six convictions for armed violence and imposed no sentence for the aggravated battery convictions, stating that the latter were included offenses of armed violence.

The State argues that the armed violence convictions were based on the shots that actually struck the children while the aggravated battery convictions were, at least in part, based on shots that missed the children. Our examination of the record, and more specifically of the charging instruments, does not support this contention. We therefore vacate the defendant's convictions for aggravated battery. See *People v. Kujawa* (1985), 132 Ill. App. 3d 828, 477 N.E.2d 759.

For the foregoing reasons, we affirm defendant's six convictions for armed violence and the consecutive sentences of 20 years' imprisonment imposed for each, but vacate the convictions for aggravated battery.

Affirmed in part and vacated in part.

RARICK and GOLDENHERSH, JJ., concur.