Docket Nos. 88508, 88513 cons.–Agenda 7–March 2001.

THE PEOPLE OF THE STATE OF ILLINOIS, Appellant and Cross-Appellee, v. JON ROE MORGAN, Appellee and Cross-

 Appellant.

Opinion filed October 18, 2001.

JUSTICE THOMAS delivered the opinion of the court:

Defendant, Jon Roe Morgan (Jon), was charged with the murders of his grandparents, Keith and Lila Cearlock. At the time of the murders, Jon was 14 years old. Jon’s case was transferred from juvenile court to the adult division of the criminal court. Following a jury trial, Jon was convicted of the second degree murder of Keith Cearlock and the first degree murder of Lila Cearlock. Jon was sentenced to consecutive prison terms of 58 years for the first degree murder conviction and 17 years for the second degree murder conviction, for a total of 75 years imprisonment.

On appeal, the appellate court affirmed Jon’s second degree murder conviction, reversed Jon’s first degree murder conviction, and remanded for a new trial as to the murder of Lila Cearlock. 307 Ill. App. 3d 707. Jon and the State each filed petitions for leave to appeal the appellate court’s decision. See 177 Ill. 2d R. 315. This court granted both petitions and consolidated the appeals.

BACKGROUND

On April 27, 1995, around 8:30 p.m., officers responded to a report of shots fired at Seventh and Washington Streets in Lincoln, Illinois. Upon arriving at the scene, Officer Tim Kerns observed an elderly woman lying face down in the front yard of 1206 Seventh Street, with a gunshot wound in her back. Inside the home, Officer Kerns saw an elderly man lying on his back with a gunshot wound in his left temple. The man and woman, who later died of their injuries, were identified as Keith and Lila Cearlock.

After the crime scene had been secured with tape around the perimeter of the house, one of the officers, Deputy Sheriff Bob Spickard, noticed a young man, later identified as Jon, walking across the grass and through the crime scene tape. Spickard ordered Jon to stop, but Jon nonetheless approached Spickard and handed him a gun and a box of bullets. Jon said to Spickard, “I did it. I killed them.” Upon hearing this, Spickard took Jon to the front of the house, where Detective Michael Harberts and other officers were standing. Spickard told Harberts that Jon had turned over the gun and ammunition and had admitted to the shooting. Harberts then asked Jon, “Why did you shoot these two people?” Jon responded, “They pissed me off. I couldn’t take it anymore so I shot them.” Harberts then instructed Officer Kerns to arrest Jon. Jon was handcuffed and placed inside a squad car. Before being transported to the Logan County jail, Jon was taken out of the squad car two separate times so that witnesses could identify him. At the jail, the officers learned that Jon was 14 years old.

Around 9:05 p.m., Harberts interviewed Jon. Jon told Harberts that the deceased were his grandparents and that they were his legal guardians. Harberts attempted to tape record the interview, but later discovered that the tape had not recorded. With Jon’s consent, Harberts then interviewed Jon a second time.

At trial, Jon testified that, on the day of the shootings, he came home from school and fell asleep on his bed. Keith awakened Jon around 6:30 p.m., demanding an explanation concerning a detention for tardiness that Jon had received. Keith screamed at Jon for 10 to 15 minutes. Lila also yelled at Jon about the detentions. Keith then directed Jon to get Keith’s razor strap, told Jon to bend over and grab his ankles, and, using all his strength, hit Jon with the razor strap across his buttocks five times. Keith and Lila then continued to yell at Jon, so Jon yelled back at them. Keith then swung his fist at Jon. Jon jumped out of the way and ran to the bathroom.

Jon went into the bathroom, then went to Keith’s closet shelf to get a gun to protect himself from Keith. Jon took the gun and a box of ammunition back to the bathroom and loaded eight bullets into the gun. At that point, Jon started thinking about killing himself. For some reason, Jon fired at a bottle of Tilex cleaner that was on the bathtub. Jon then stepped out of the bathroom and saw Lila screaming. Jon claimed that although he then became scared, he still was not thinking about killing his grandparents.

Jon saw Keith coming around the corner and could see that Keith was very angry. Thinking that Keith was going to beat him to death, Jon lifted the gun and shot Keith so that Keith could not get to him. After Jon shot Keith, Lila started to turn around and run toward the front door. Jon thought Lila was just as dangerous as Keith because Keith beat Jon only when Lila pressured Keith to do so. Jon followed Lila as she started to run out the front door and shot Lila in the back. Lila managed to make it out the front door, but collapsed in the front yard. Jon followed Lila out the door and attempted to shoot her again, but his gun jammed.

Jon then went back inside the house and broke the lock on the door to Lila’s room in order to look for her gun. When he could not find Lila’s gun, Jon changed his clothes and left the house, still carrying Keith’s gun and the box of bullets. Jon walked toward a friend’s house and, as he was walking, attempted to unjam the gun. The gun accidentally discharged two times. Jon testified that he walked to his friend’s house because he wanted some help and needed to talk to someone. When he learned that his friend, Steve Powell, was not home, he decided to walk back home. Jon testified that he felt he needed some help and thought that the police would be at his house and could help him. Jon said that he returned home in order to turn himself in for the shootings.

Testimony concerning Jon’s upbringing revealed that Jon was born on August 20, 1980, to Glenda and Roe Morgan. Roe drank heavily and was physically abusive toward his children. When Jon was in kindergarten in Virginia, he was referred for a psychological evaluation for behavior problems at school, including impulsiveness, aggressiveness, and hyperactivity. Jon was hospitalized at the Psychiatric Institute of Richmond (the Psychiatric Institute) from March 31, 1986, through May 16, 1986. Jon was diagnosed as suffering from Attention Deficit Disorder (ADD) and depression. Jon was prescribed an antidepressant to target his depression and hyperactivity.

Jon was admitted to the Psychiatric Institute a second time on February 18, 1987, where he remained until March 29, 1987. Jon’s discharge summary indicated that Glenda claimed Jon had become so aggressive that he was unmanageable. Jon was defiant toward parental authority, had dropped his newborn sister on the floor, and was aggressive toward his other siblings. Jon again was diagnosed with ADD and depression. Jon continued taking his antidepressant medication both during his hospitalization and upon discharge. Following Jon’s second discharge from the Psychiatric Institute, Glenda Ashworth decided to send Jon to live with her parents, Keith and Lila Cearlock, in Lincoln, Illinois. At the time, the marriage of Glenda and Roe was breaking up, and Glenda felt that the Cearlocks offered a more stable home. Jon had no contact with his father from the time of his parents’ divorce until his arrest for the Cearlocks’ murders.

Jon moved in with the Cearlocks when he was seven years old and began attending school at Park Meadows Baptist Church and Academy (Park Meadows). The Cearlocks and the principal of Park Meadows agreed that Jon should be taken off his medication. Jon testified that, when he got into trouble at Park Meadows, he would receive detentions or was paddled by the principal. Jon also testified that Keith frequently beat him with a razor strap, usually at the urging of Lila.

Jon moved back home with Glenda, now remarried to Linwood Ashworth, for his fifth- and sixth-grade school years. Linwood, however, began drinking and became physically abusive toward Jon and his sisters, so Glenda sent Jon back to Lincoln to live with the Cearlocks. Jon testified that Keith and Lila had a very poor relationship and slept in separate bedrooms. Jon also testified that Keith and Lila were negative and constantly criticized Jon. Keith frequently told Jon if he ever fought back when Keith was beating him, Keith would kill Jon while Jon was sleeping. Jon believed Keith.

When Jon returned to the Cearlocks’ home the second time, Jon again attended Park Meadows. Jon did well in school and was on the honor roll nearly every quarter. However, on February 7, 1995, Jon was expelled from Park Meadows after another student saw Jon kissing a girl outside the girl’s house. According to school policy, students could be expelled for kissing. Despite the policy, Jon initially was told that he could serve a suspension. Jon refused to agree to the terms of the suspension. The principal of Park Meadows tried to arrange for Jon to attend a school in Oklahoma, but Keith would not agree. After Keith later changed his mind about the Oklahoma school, Jon refused to go.

Following Jon’s expulsion, Glenda asked Keith to bring Jon home. Keith drove Jon to Virginia, but before Jon arrived, Glenda changed her mind and decided that she could not afford to have Jon in her home. When Keith and Jon arrived in Virginia, Glenda told Jon that he could not stay. Jon was very upset with this news. Keith and Jon returned to Lincoln, and Jon attended the public high school from March 17, 1995, until the time of the murders.

At his trial, Jon testified that he did not tell the police that Keith beat him because he did not want to disrespect his grandparents and did not want to reveal his personal problems. Jon admitted that he did not bring up the beatings until he met with Dr. Robert Chapman, who interviewed Jon at the request of the State to determine Jon’s fitness to stand trial. Jon also agreed that he never told Harberts that Keith had threatened to kill him.

As noted, Jon was convicted of the first degree murder of Lila Cearlock and the second degree murder of Keith Cearlock. Jon appealed his convictions to the appellate court. In that appeal, Jon claimed that: (1) it was improper to try him as an adult; (2) certain statements were admitted into evidence erroneously; (3) the trial court erroneously excluded testimony concerning prior violent conduct by the Cearlocks; (4) the trial court erred in refusing to dismiss the felony murder counts; and (5) he should have received second degree murder instructions with respect to the felony- murder counts. 307 Ill. App. 3d at 708-09.

The appellate court agreed with Jon that his initial statement to Harberts at the scene of the crime should have been suppressed. See 307 Ill. App. 3d at 710 (unpublished material under Supreme Court Rule 23). The appellate court also agreed that Jon could not be found guilty of felony murder where the underlying felonies did not have an independent felonious purpose. 307 Ill. App. 3d at 712-15. In addition, the appellate court held that Jon should have received second degree murder instructions as to the charges of felony murder. 307 Ill. App. 3d at 715-17. Finally, the appellate court agreed with Jon that the trial court had improperly excluded the testimony of Glenda and Dr. Hart concerning Glenda’s childhood. See 307 Ill. App. 3d at 710 (unpublished material under Supreme Court Rule 23). The appellate court affirmed Jon’s conviction for the second degree murder of Keith, reversed his conviction for the first degree murder of Lila, and remanded for a new trial.

We first address the issues raised by Jon in his appeal. In this court, Jon again contends that his transfer from juvenile court was erroneous. Jon also argues that his motion to suppress the statements he made while in police custody should have been granted.

TRANSFER FROM JUVENILE COURT

Jon’s transfer hearing took place over three days and included the testimony of seven witnesses. At the transfer hearing, Detective Harberts testified on behalf of the State. Harberts testified that after he asked Jon why he had shot the people, Harberts told another officer to place Jon under arrest. At the time, Harberts did not know Jon’s age. At the jail, Harberts read Jon his 
Miranda
 rights, and Jon told Harberts what had happened that evening.

Jon explained that he had received a detention that day for tardiness, and his grandparents were complaining to him about the detention. Jon became angry because his grandparents kept going on about the detention, so after several minutes of criticism, he went into the bathroom. He then left the bathroom and went to his grandfather’s bedroom to get his grandfather’s gun and ammunition. Jon took the gun and the ammunition back into the bathroom and loaded the gun. Jon saw a Tilex bottle sitting on the bathtub and decided to shoot it.

After Jon shot the Tilex bottle, he walked out of the bathroom and down the hall toward the living room. Jon’s grandmother, Lila, was in the living room and saw Jon with the gun in his right hand. Lila screamed and backed up. Jon’s grandfather, Keith, then came around the corner quickly. As Keith’s head came into view, Jon raised the gun and shot Keith in the left side of the head. Keith fell to the floor and Lila attempted to run out the front door. Jon shot Lila in the upper left shoulder and the upper left area of her back. Lila made it out the door, but after going several steps, she fell down by a tree. Jon told Harberts that he chased Lila and attempted to pull the trigger again, but the gun jammed. Jon stood over Lila where she had fallen and attempted to unjam the gun so he could continue shooting her.

Jon then went back into the house to get Lila’s gun because he wanted to shoot her some more. Jon could not find the gun so he went into his bedroom and changed his clothes. Jon left the house with the gun and the bullets and went to his friend Steve Powell’s home. Jon discovered that Steve Powell was not home, so he decided to return to his grandparents’ home and give himself up.

Harberts asked Jon if he recalled what he had said when Harberts asked Jon why he had shot the two people. Jon said he recalled saying that “they pissed me off. I couldn’t take it anymore, so I shot them.” Harberts then asked Jon if he previously had thought about killing his grandparents. Jon said that he had thought about it a few times. Harberts asked Jon if he had figured out how he would kill his grandparents, and Jon replied that he would use a gun. When Harberts asked Jon if he had thought about killing other people, Jon responded that he had, and said that he would use a gun. Jon explained that he thought about killing other people if people made him mad. Harberts asked Jon if Jon would want to kill him if he made Jon mad. Jon said that he would not want to kill Harberts if he made him mad one time, but if Harberts made him mad several times, Jon would want to kill him.

Jon denied any history of mental illness in his family and said that he had not consumed any illegal drugs or alcohol. After Harberts concluded his interview with Jon, he discovered that the tape of the interview did not record and asked Jon if he would do a second interview. Jon agreed, and a tape was made of the second interview.

During the second interview, Harberts again read Jon his 
Miranda
 rights. Jon generally repeated the statements he had made in the first interview. Jon said that he did not start out the evening planning to kill his grandparents. He began thinking about it when his grandfather was talking to him and telling him that people would not hire him because he was late and that teachers would not like him because he was tardy. Jon said that at that time, “it entered my mind that I was getting sick of this.” Jon thought about it for 15 minutes before he went and got the gun. Harberts asked Jon if Jon remembered telling Harberts during the first interview that Jon had thought about killing other people. The following exchange then took place:

“[Harberts]: When I talked to you earlier you told me that at times you thought about killing other people, can you tell me about that?

[Jon]: No sir.

[Harberts]: You don’t remember saying that?

[Jon]: I don’t want to talk about that.”

Harberts further testified that on May 10, 1995, he had a conversation with Pastor Davis, the pastor of the church that Jon and his grandparents attended. Pastor Davis told Harberts that, on April 2, 1995, he had a conversation with Keith Cearlock and asked Keith how Jon was doing since he had been expelled. Keith told Pastor Davis that Jon was not doing well and that Lila was afraid that Jon was going to physically harm her. Pastor Davis said that Keith told Jon that if Jon hit him, Keith would not hit back, but instead would get Jon while he was sleeping.

Pastor Thomas Bryant then testified on behalf of the State. Bryant is the associate pastor and the principal of Park Meadows. Bryant testified that, on April 19, 1995, he, his wife, and Lila Cearlock were in his wife’s office when Lila told them that Jon had slammed her hand down on the table and had shoved her up against the wall during a dispute over a television remote. On April 22, 1995, Bryant had a conversation with Keith concerning the incident with the remote and told Keith that Keith needed to discipline Jon or get him out of the home before somebody was hurt. Keith responded that he “sure wouldn’t paddle” Jon because Jon was too big and strong. Bryant testified that, several times over the preceding year, Keith mentioned that he did not spank Jon anymore because he felt Jon was too big.

Bryant testified that, on February 7, 1995, Jon had been expelled from Park Meadows. Bryant explained that there were several incidents leading to the expulsion. Jon had a long history of discipline problems. After Jon was expelled, however, a group of students asked Bryant to reconsider the expulsion. Bryant told the students that they could ask Jon about coming back to school. The students then spoke with Jon and told Bryant that he had said, “I have been hurt all my life. I’m not going to be hurt anymore. From now on I will do the hurting.” Bryant also had a conversation with Jon about returning to school. When Jon refused to agree to the conditions necessary for his return to school, Bryant told Jon not to turn his back on God. Jon responded that he intended “to commit every sin that I want to commit. I’m going to do anything and everything I want to do, and when I hit rock bottom, then I will call on God.”

The next witness to testify on behalf of the State was Kim Turner, a juvenile probation officer for Logan County. Turner prepared a social investigation report of Jon based upon police reports, interviews with Jon and his mother and father, psychiatric information, and school records. Turner noted that Jon had been hospitalized in the Psychiatric Institute when he was five years old and again when he was six years old. Aside from an evaluation concerning his fitness to stand trial, however, Jon had no other psychiatric treatment or evaluations since he was six years old.

Turner said that, when Jon first moved in with his grandparents, records showed that Jon’s mother said Jon had become so aggressive that he was unmanageable. The discharge summary from Jon’s first stay at the Psychiatric Institute indicated that Jon “was assaultive toward his classmates, constantly goading and threatening them.” Jon also had admitted that he could harm his mother. Jon’s discharge summary from his second stay at the Psychiatric Institute noted that Jon had been “quite hostile, threatening, and even aggressive toward peers.” In addition, Jon had been aggressive toward his siblings.

Turner testified that she did not believe that Jon had an appropriate support system available to him, as his grandparents had been killed and his parents were not an option for placement. Turner checked with a program that takes more violent offenders, but the director of admissions indicated that Jon would not be appropriate for their facility. Turner said that, based upon Jon’s lack of support, the lack of a treatment plan, and the nature of his criminal offenses, Jon’s chance of rehabilitation was unlikely. She did not think that a plan of rehabilitation could be developed, in light of Jon’s inability to change his behavior in the past.

Turner testified that, if Jon was committed to the Department of Corrections through the juvenile court, he would go to the reception center for the Juvenile Department of Corrections, which provides treatment for any psychological or psychiatric disorders. The facility also would be able to deal with Jon’s ADD. If Jon was sentenced to the Department of Corrections as an adult, he still would first go to the Juvenile Department of Corrections, and would be held there until the age of 21 unless there was some problem. If Jon was a security risk or a real problem, he could be transferred to the adult Department of Corrections at age 17 or age 18. If Jon was sentenced through the juvenile system, he would be released at the age of 21. Turner said that the adult division of the Department of Corrections had the same services available as the juvenile division as far as treatment for any psychiatric or psychological disorders.

In Turner’s interview with Jon, Jon told her that his grandfather’s usual form of punishment was grounding, although in the past his grandfather had used a strap to spank him. Jon did not tell Turner that his grandfather had spanked him on the night of the killings. On cross-examination, Turner said that, in preparing her report, she took into account the fact that Jon had no prior history with the police.

Jon’s mother, Glenda Ashworth, then testified on his behalf. Glenda said that Jon was put on medication for his ADD after both of his stays at the Psychiatric Institute. The Cearlocks did not like the fact that Jon was on medication and took Jon off his medication. Glenda said that Jon told her that on the night of the shootings Lila had been nagging him all night about his detention. Keith then told Jon that he would never amount to anything, and Jon smarted off. Keith then hit Jon five times with his razor strap. Jon then got the gun and went into the bathroom. While in the bathroom, the gun went off, and the Cearlocks came running down the hall. Jon then stepped into the hallway and shot them.

In addition to the foregoing testimony, a report prepared by Dr. Robert Chapman was admitted into evidence at the transfer hearing. Dr. Chapman had conducted a psychiatric evaluation of Jon to determine his fitness to stand trial. Jon told Dr. Chapman that his grandparents constantly were negative and complaining. Jon said that his grandparents did not like Jon’s father because Jon’s father was not “Christian perfect.” Dr. Chapman noted that the records from the Psychiatric Institute showed that Jon had been in the institute for three months when he was five years old and for two months when he was six years old. Jon was placed on antidepressant medication during both stays.

Jon told Dr. Chapman about the events leading to the murders. Jon told Dr. Chapman that, after Keith hit Jon with the razor strap, Jon went into the bathroom, left the bathroom to get Keith’s gun, and then returned to the bathroom and began loading the gun out of anger. Jon then shot a Tilex bottle and came out of the bathroom again. Lila saw Jon and began backing away. Jon told Dr. Chapman, “I knew I had to do something or they would call the police.” Jon said he panicked, and when Keith came around the corner, Jon shot him. As Lila turned to run, Jon shot her in the back, then tried to shoot her some more but the gun jammed. Jon claimed that although it had been hard for him to remember he had received a spanking from Keith on the day of the murders because he tried to put that “stuff” out of his mind, he later remembered the spanking and told his attorney.

In his interview with Dr. Chapman, Jon denied that he had ever thought about killing his grandparents before. Jon claimed that he retrieved Keith’s gun in order to shoot himself. After Jon impulsively shot the Tilex bottle, he knew he “had to do something” because he believed Keith would kill him. Jon said that he shot Lila because he “knew he had to shoot her to get everybody’s attention.” Jon also admitted to intrusive thoughts of shooting the people at church. Dr. Chapman opined that Jon had not acted in a premeditated manner at the time of the shootings, but instead had acted in a state of sudden and intense passion.

The decision to permit prosecution of a juvenile under the criminal law is a matter of judicial discretion, although that discretion is limited and controlled by the Juvenile Court Act of 1987 (the Act) (705 ILCS 405/1–1 
et seq.
 (West 1994)). 
People v. M.D.
, 101 Ill. 2d 73, 83 (1984). Under the provisions of the Act in effect at the time of Jon’s transfer, a juvenile court judge could enter an order permitting a minor 13 years of age or older to be prosecuted under the criminal laws of the state if the judge found that it was “not in the best interests of the minor or of the public to proceed under this Act.” 705 ILCS 405/5–4(3)(a) (West 1994) (repealed by Pub. Act 90–590, art. 2001, §2001–15, eff. January 1, 1999, now 705 ILCS 405/5–805 (West 2000)). Pursuant to section 5–4(3)(b) of the Act (705 ILCS 405/5–4(3)(b) (West 1994) (repealed by Pub. Act 90–590, art. 2001, §2001–15, eff. January 1, 1999, now 705 ILCS 405/5–805 (West 2000))), a trial court was to consider, among other matters, seven factors in reaching a decision on whether to prosecute a particular minor as an adult. 
M.D.
, 101 Ill. 2d at 83-84. Those seven factors were:

“(i) whether there is sufficient evidence upon which a grand jury may be expected to return an indictment; (ii) whether there is evidence that the alleged offense was committed in an aggressive and premeditated manner; (iii) the age of the minor; (iv) the previous history of the minor; (v) whether there are facilities particularly available to the Juvenile Court for the treatment and rehabilitation of the minor; (vi) whether the best interest of the minor and the security of the public may require that the minor continue in custody or under supervision for a period extending beyond his minority; [and] (vii) whether the minor possessed a deadly weapon when committing the alleged offense.” 705 ILCS 405/5–4(3)(b) (West 1994).

Looking at the statutory factors, the juvenile court in this case found that the grand jury would be expected to return an indictment. The court also found that the alleged offenses had been committed in an aggressive and premeditated manner. Third, the court noted that, if Jon were four months older, he automatically would be transferred to adult court. With regard to Jon’s history, the fourth factor, the court stated that Jon had an unusual and a sad life, and that his parents and grandparents had failed him by not seeing that his medication and his treatment for ADD were continued. The court next found that there were not any facilities unique to juveniles that were not available to adults, and that, in any event, even if Jon should be convicted in adult court, he first would go to the juvenile division. As to the sixth factor, whether it was in the interest of the minor and the public that custody continue past Jon’s majority, the court observed that if Jon should be convicted in juvenile court, he would be released at age 21 whether or not he was rehabilitated. Finally, the court found that Jon did have a deadly weapon when committing the offenses. The court then stated that after balancing the statutory factors, along with the fact that if Jon “stood convicted of a couple first degree murders, that his sentence of mandatory imprisonment would be imposed,” the court concluded that it was in the best interest of the public that Jon be transferred to the adult division of the courts. On appeal, the appellate court affirmed the transfer from juvenile court to adult court.

As noted, Jon argues that the appellate court erred in affirming his transfer from juvenile court to the circuit court. Jon contends that the juvenile court abused its discretion in its consideration of the factors set forth in section 5–4 of the Act (705 ILCS 405/5–4 (West 1994)). Jon argues that a balancing of those factors weighs against transfer. Jon also maintains that the juvenile court misunderstood the sentence that would be imposed if Jon was tried and convicted as an adult.

It is clear that the purpose of a transfer proceeding is to balance the best interests of a juvenile offender, particularly as the offender’s interests relate to his potential for rehabilitation, against society’s legitimate interest in being protected from criminal victimization perpetrated by minors. 
People v. Clark
, 119 Ill. 2d 1, 12 (1987). In striking this balance, a juvenile court judge is to weigh the facts of the alleged crime, particularly whether the crime was committed in an aggressive and premeditated manner. 
Clark
, 119 Ill. 2d at 12.

Jon argues that the juvenile court judge in this case improperly considered that the crime had been committed in an aggressive and premeditated manner. Jon denies that there was evidence he had previously talked about killing his grandparents. In support of this argument, Jon notes that he was not lying in wait for his grandparents, that he actually was contemplating suicide when he retrieved the gun, and that he irrationally shot the Tilex bottle, causing him to panic and believe that Keith would kill him. Jon further claims there was a lack of planning as to how he was going to escape, evidenced by his changing of clothes and walking toward Steve Powell’s house. Jon also cites two cases where a juvenile’s acts were found to be premeditated, and notes that in those cases, in contrast to his case, the defendants planned the crime, armed themselves, and made specific plans to cover up their conduct. See 
People v. D.B.
, 202 Ill. App. 3d 194 (1990); 
People v. Beck
, 190 Ill. App. 3d 748 (1989). Finally, Jon observes that the appellate court in this case conceded that the shooting of Keith was not a planned act.

We find sufficient evidence in the record to support the trial court’s finding that the offenses in this case occurred in an aggressive and premeditated manner. In contrast to Jon’s statements to Dr. Chapman, Detective Harberts testified that when he first interviewed Jon, Jon told Harberts that he had thought about killing his grandparents a few times previously, and figured he would use a gun. During the second interview, Jon told Harberts that he did not start the evening planning to kill his grandparents, but began thinking about it when Keith was yelling at Jon about his tardiness. Jon never told Harberts that Keith had beaten him with a razor strap prior to the shootings. Jon said that he thought about killing his grandparents for around 15 minutes before he got the gun. Jon also said that he chased Lila out of the house and attempted to shoot her again, but the gun jammed. Jon then went into the house to retrieve Lila’s gun so that he could shoot her some more.

In a transfer hearing under the Act, the State need only present evidence sufficient to sustain a finding of probable cause. 
People v. Taylor
, 76 Ill. 2d 289, 304 (1979). Here, the State presented evidence that Jon had thought of killing his grandparents before, had thought about how he would kill them, and had thought about killing them for approximately 15 minutes prior to obtaining the gun. With regard to Lila, the State presented evidence that Jon tried to shoot her even after she had fallen, and even tried to find Lila’s gun so that he could continue shooting her after Keith’s gun jammed. Moreover, although Jon contends that he was so afraid of his grandparents that he acted impulsively, Jon did not tell the officers or Kim Turner that Keith had hit him with a razor strap prior to the murders. Thus, while Jon’s actions may not have been as planned as those of the defendants in 
D.B.
 and 
Beck
, we find the State’s evidence of premeditation was sufficient to sustain a finding of probable cause.

In addition to the facts of the alleged crime, including premeditation and aggressiveness, a juvenile court judge is to consider the age of the offender and his previous history, is to ascertain the availability of treatment and rehabilitative services for the juvenile, and is to determine whether the best interests of the minor and of the public may require that the minor continue in custody beyond his minority. 
Clark
, 119 Ill. 2d at 13. This court has declined to prescribe a mathematical formula to govern a judge’s discretion in weighing each factor. 
Taylor
, 76 Ill. 2d at 305.

Jon, however, argues that the juvenile court erred in considering these factors. For example, Jon claims that the juvenile court failed to consider his age in light of his sheltered life experiences, his lack of a prior criminal history, and his tragic life. Jon distinguishes his case from those where juvenile defendants were found to be so “streetwise” and experienced beyond their years that they had ceased being children. See 
People v. M.D.
, 101 Ill. 2d 73, 86 (1984) (juvenile was “not a stranger to adult experiences,” including drinking alcohol, using marijuana, and having sex); 
In re L.J.
, 274 Ill. App. 3d 977, 980 (1995) (L.J. had life experiences of someone “way beyond his age” and, in reality, had ceased being a minor).

Rather, Jon claims his case is similar to 
People v. D.B.
, 202 Ill. App. 3d 194 (1990), where the denial of the State’s motion to transfer was affirmed, based in part upon the fact that the juvenile did not exhibit the experience of someone well beyond his years. Jon also finds close parallels between his case and that of the minor in 
In re Burns
, 67 Ill. App. 3d 361, 366 (1978), where the court found that the juvenile’s history of neglect, deprivation, emotional impoverishment and chaos favored treatment as a seriously troubled adolescent rather than as an adult.

While we do not read the trial court’s ruling as granting the State’s motion for transfer simply because Jon was only four months shy of an automatic transfer, we note that this case is not as similar to 
D.B.
 and to 
Burns
 as Jon represents. In fact, one highly significant difference is that in both 
D.B.
 and 
Burns
, the juveniles did not personally participate in the killing of the victims, but instead were held legally accountable. See 
D.B.
, 202 Ill. App. 3d at 202 (“although legally accountable for the murder, respondent did not personally kill”); 
Burns
, 67 Ill. App. 3d at 364 (“even though [Burns] may be legally accountable for the murder which occurred, the evidence also suggests that [Burns] did not premeditate, or even take part in, the actual stabbing”). Therefore, we are not persuaded that Jon’s case is so similar to 
D.B.
 and 
Burns
 that Jon’s transfer was an abuse of discretion.

In any event, in reviewing a juvenile court’s order transferring a minor, this court does not reweigh the factors. Rather, to affirm an order transferring a minor to criminal court, this court must determine if there was sufficient evidence in the record as to each statutory factor to support the transfer order. 
Clark
, 119 Ill. 2d at 18. Here, the juvenile court 
received extensive evidence concerning Jon’s history, as presented through the testimony of Kim Turner and Glenda Ashworth, and the report of Dr. Chapman. There was significant testimony concerning Jon’s sheltered background, his lack of prior contact with the police, and his shuttling between his mother’s home and his grandparents’ home. Consequently, there was sufficient evidence in the record as to Jon’s age and history.

Jon also contends that the juvenile court failed to consider Jon’s potential for rehabilitation, and failed to receive and evaluate information about the type of facilities available for treatment and rehabilitation. Jon further claims that the juvenile court failed to make any meaningful analysis of Jon’s interest versus society’s interests.

As discussed, a statutorily proper evaluation of a minor’s history also includes receipt and review of information concerning the minor’s familial support for any possible treatment or rehabilitation, in addition to any prior involvement in the juvenile justice system. 
Clark
, 119 Ill. 2d at 17. A juvenile judge also must receive and evaluate information concerning the type of facilities available for the treatment or rehabilitation of the minor, and must evaluate the likely effectiveness of those facilities in light of the history and present circumstances of the minor. 
Clark
, 119 Ill. 2d at 17.

Here, although Jon disputes the juvenile court’s weighing of these factors, it is clear from the record that Turner’s testimony presented information concerning the type of facilities available for Jon’s treatment or rehabilitation, as well as the likely effectiveness of those facilities in light of Jon’s history and present circumstances. Turner was of the opinion that Jon did not have familial support for any possible treatment or rehabilitation. In fact, Turner’s opinion was that Jon’s chance of rehabilitation was unlikely given Jon’s lack of support, the lack of a treatment plan, and the nature of his criminal offenses. Turner also stated that Jon would first go to the Juvenile Department of Corrections, where he would receive treatment for any psychiatric disorders and for his ADD. The adult division of the Department of Corrections had the same services available.

In light of this information, we find no merit to Jon’s claim that the juvenile court failed to consider his sheltered life experiences, his lack of a prior criminal history, and his tragic life. Nor do we find support for Jon’s contention that the juvenile court failed to consider Jon’s potential for rehabilitation, and failed to receive and evaluate information about the type of facilities available for treatment and rehabilitation. The juvenile court simply found that these factors did not outweigh the factors supporting a transfer. Where a juvenile judge considers evidence on the statutory factors and any other relevant evidence, the resulting decision is a product of sound, judicial discretion and will not be disturbed on review. 
Clark
, 119 Ill. 2d at 14.

We also find no merit to Jon’s claim that the juvenile court failed to make any meaningful analysis of Jon’s interests versus society’s interests. With regard to this factor, the juvenile court noted that there was a lot of argument concerning whether Jon could be rehabilitated before he reached majority, and noted that if Jon went through the juvenile court, he would be released whether he had been rehabilitated or not, and there would be no continued supervision. Although it is clear from the record that Jon had suffered a tragic life and had been failed by his parents and grandparents, the fact remains that he committed two homicides and had admitted to intrusive thoughts of killing those who angered him. Indeed, it is worth noting that in a later version of the Act, the legislature amended the statute on discretionary transfers to add: “In considering these factors, the court shall give greater weight to 
the seriousness of the alleged offense
 and the minor’s prior record of delinquency than to the other factors listed in this subsection.” (Emphasis added.) 705 ILCS 405/5–805 (West 2000). Here, there was sufficient probable cause to establish that Jon’s interests did not outweigh society’s interest in requiring that Jon continue in custody beyond his majority.

In addition to Jon’s claim that the juvenile court erred in weighing the statutory factors, Jon also argues that the juvenile court misunderstood the sentence that would be imposed if Jon should be tried and convicted as an adult. The juvenile court stated that if Jon was convicted of a couple of first degree murders, a sentence of mandatory imprisonment would be imposed. Jon notes that if he was convicted of one first degree murder in criminal court, mandatory imprisonment would be imposed (see 730 ILCS 5/5–8–1(a)(1) (West 1994)). However, he would face mandatory 
life
 imprisonment if convicted of two first degree murders (see 730 ILCS 5/5–8–1a)(1)(c)(ii) (West 1994)). Jon argues that this court’s decision in 
Clark
 “mandates that the court be aware and evaluate a mandatory life sentence without the possibility of parole upon conviction for two first degree murders.”

We decline to attribute great weight to the trial court’s statement that if Jon should be convicted of a couple of first degree murders, a sentence of mandatory imprisonment would be imposed. As the appellate court observed in affirming the juvenile court’s decision to transfer, a court is presumed to know the law regarding a potential sentence, and both the State and defense counsel had informed the juvenile court of the proper sentence. 
307 Ill. App. 3d 707 (unpublished material under Supreme Court Rule 23). Further, this case is distinguishable from our decision in 
Clark
, where we found that there was “not one scintilla of evidence in the record of the transfer proceeding that would have apprised anyone that the transfer could result in a term of natural life imprisonment.” 
Clark
, 119 Ill. 2d at 16. Here, in contrast, there is evidence in the record of proceeding that Jon’s transfer could result in a term of natural life imprisonment. Consequently, we agree with the appellate court that the juvenile court did not abuse its discretion in granting the State’s motion to transfer.

MOTION TO SUPPRESS STATEMENTS MADE WHILE IN POLICE CUSTODY

Jon’s second argument on appeal is that the appellate court erred in affirming the trial court’s denial of his motion to suppress the statements that Jon made while in police custody. At the hearing on Jon’s motion to suppress, Sergeant Darrell Sisk testified that he is the juvenile officer for the Lincoln city police department. Sisk said that, on the evening of April 27, 1995, he received a telephone call from another officer asking if he knew the minor, Jon, that they had as a suspect. Sisk responded that he did not know the minor. Sisk said that he was not told the nature of the juvenile’s crime and was not asked to come down to the station.

Detective Harberts testified at the hearing on Jon’s motion to suppress. To the extent that Harberts’ testimony is duplicative of his testimony at the transfer hearing, it will not be repeated here. Harberts said that when Spickard and Jon approached him at the crime scene, Jon was not handcuffed or restrained in any way. When Harberts instructed Officer Kerns to handcuff Jon and place him in a police car, Harberts believed Jon to be 18 or 19 years old.

After Jon had been transported to the Logan County jail, Harberts went to Jon’s holding cell and asked Jon’s name, age, and relationship to the victims. Harberts then asked Jon if he would be willing to come to Harberts’ office for an interview, and, when Jon agreed, Harberts took Jon, unrestrained, to his office. Jon sat at Harberts’ desk, across from Harberts. Harberts asked Jon if he needed something to drink or eat, or needed to use the restroom. Jon responded “no,” and then agreed to speak with Harberts. Harberts read Jon his 
Miranda
 rights and asked Jon if he understood each right. Jon responded affirmatively. Harberts said Jon was very cooperative throughout the interview. Jon never asked Harberts to stop questioning him, did not ask for any adult presence, and did not request a lawyer. Harberts did not threaten or coerce Jon, nor did he promise Jon anything. This interview began at 9:05 p.m. and ended at 9:27 p.m. At the end of the interview, Jon told Harberts his mother’s name and gave Harberts her telephone number.

Harberts testified that, at 10:45 p.m., he attempted to call Glenda Ashworth. He reached Glenda’s answering machine and left a message. After leaving a message for Glenda, Harberts discovered that his interview with Jon did not record on the tape. Harberts asked Jon if he would allow Harberts to tape a second interview, and Jon agreed. During this second interview, Harberts again read Jon his 
Miranda
 rights. Jon did not ask for any adult or for a lawyer. This interview took place between 11:07 p.m. and 11:30 p.m. Later, around 12:40 a.m., Jon agreed to accompany the officers back to his grandparents’ residence and led the officers through a video reenactment of what had occurred earlier that day. Jon was not shackled during the reenactment.

On cross-examination, Harberts agreed that, after Spickard and Jon walked up to him at the Cearlocks’ home, he would not have let Jon walk away. Harberts also testified that he did not give Jon any 
Miranda
 warnings before he asked Jon why he had shot the people. Harberts also said that, when Jon was in the holding cell at the station, he did not tell Jon that Jon could be detained for a maximum of six hours. Harberts testified that Jon told him that the Cearlocks were Jon’s legal guardians. When Harberts began interviewing Jon, he did not tell Jon that Jon could be charged or tried as an adult.

Glenda Ashworth testified that, on April 27, 1995, she was working a 7 p.m. to 7 a.m. shift. Glenda said that she ran home around 4 a.m. on April 28, 1995, because her daughter was afraid someone was trying to break into the house. After she calmed her children, Glenda noticed the light on her answering machine flashing. Glenda played the message, then called Harberts, who told Glenda what had happened and asked her who had custody of Jon. Glenda told Harberts that she had custody, and also told Harberts about Jon’s medical history and his ADD. Glenda asked Harberts if Jon had a lawyer. Harberts told Glenda that she would have to talk to the State’s Attorney. On cross-examination, Glenda acknowledged that she had signed a document giving her parents custody and guardianship of Jon, but said that the document was used only to get Jon into school.

Jon testified at the hearing on his motion to suppress that he was 15 years old. Jon said that when his grandparents punished him, he would be grounded, or he would be yelled at, or he would be spanked. Jon explained that his grandfather would have Jon bend over and grab his ankles, and then would whip Jon with a razor strap.

Jon testified that, when he left Steve Powell’s house on April 27, 1995, he decided to walk back to the Cearlock’s house because he needed to get some help and thought the police would be there. Jon thought the police could help him. At the time, Jon said he felt confused, scared, hopeless, upset, angry and sad. Jon said that he gave the gun to Spickard and told Spickard that he was the one that had shot the Cearlocks. Jon made that statement because that was what had happened, and because he had to get some help. Jon said that, after he gave the gun to Spickard, he did not feel like he could walk away because Spickard was holding Jon’s elbow and told Jon to come with him. Jon said it did not cross his mind to run because he thought the officers could help him. Jon said that he answered Harberts’ question about why Jon had done it because he did not feel like he had a choice. Jon testified that he did not understand the significance of answering the question.

Jon said that he did not see a tape recorder during the first interview with Harberts. Jon denied that Harberts read Jon his 
Miranda
 rights before the first interview. Jon testified that when Harberts began asking him questions, Jon answered the questions because Harberts was the boss and Jon was supposed to tell Harberts what Harberts wanted to know. Harberts did not ask Jon where his mom or dad were and did not tell Jon that a juvenile police officer was supposed to be there.

For the second interview, Harberts placed a tape recorder on the desk, turned the recorder on, and read Jon his 
Miranda
 warnings. Jon claimed that he did not understand his 
Miranda
 warnings and only indicated that he understood them because he “was just going along with what [Harberts] was saying.” Jon said that he did not feel that he had the right to tell Harberts he did not want to answer any questions. Jon also said that he participated in the video reenactment because the officers wanted him to, and Jon felt that he did not have a choice.

On cross-examination, Jon agreed that he understood he had committed a crime and agreed that he wanted to confess to the crime. Jon also agreed that, during the second interview, when Harberts asked him a question that he did not want to answer, he felt free to say no to Harberts. Jon said that the officers did not threaten him or make any promises to him. Jon testified that he was doing well in school before he was expelled from Park Meadows.

Dr. Robert Chapman testified that Jon found it difficult and confining to follow the rules of the church and the school. Jon said he was subjected to harsh criticism by his grandparents and frequently was subjected to physical discipline. Lila would impulsively slap Jon with her hand or with objects. Keith would make Jon bend over and grab his ankles, then would beat Jon on the buttocks with a board or strap.

Dr. Chapman’s opinion was that Jon suffered from ADD. Dr. Chapman said that taking into account Jon’s age, his background, his ADD, and the circumstances, Jon was substantially impaired in his capacity to appreciate the gravity of the situation in waiving his 
Miranda
 rights. Dr. Chapman testified that, on the day of the shootings, Jon was not suffering from any psychosis or delusions.

On cross-examination, Dr. Chapman said that Jon was able to understand the words used by the police officers in giving the 
Miranda
 warnings. Dr. Chapman explained that his opinion related to Jon’s inability to appreciate the legal significance of talking to the police. Dr. Chapman agreed that Jon talked to the police because Jon wanted to talk to the police.

Pastor Thomas Bryant testified that Jon’s reading and writing skills were normal, as were Jon’s verbal skills. Pastor Bryant said that Jon’s demeanor in the video of the reenactment and in the audio tape of his second interview with Harberts was Jon’s normal demeanor, which was very calm. Pastor Bryant said that Jon was very honest and truthful in admitting when he had done something wrong. Pastor Bryant denied that Jon had signs of ADD during his years at Park Meadows, and said that Jon was never referred to any special school or program for ADD.

Following a hearing on Jon’s motion to suppress, the trial court found that Jon was of average intelligence, appeared emotionally stable, and was articulate and familiar with the English language. The trial court concluded that Jon was aware of his 
Miranda 
rights, understood them, and knowingly waived them. The trial court noted that no threats or promises were made to Jon, nor was he abused or denied access to food, drink or the bathroom during his interrogation. Further, at one point, Jon indicated to the officer that he did not wish to answer a particular question. The trial court stated that, “[w]ith regard to the violation of the Juvenile Court Act, the Courts certainly do not condone such violation but higher Courts, on review, have made it clear that such a violation does not cause a per se suppression ***.” The trial court concluded that Jon’s statements were made voluntarily. The appellate court affirmed the trial court’s denial of Jon’s motion to suppress the statements made while in police custody.

On appeal to this court, Jon argues first that his age, experience and emotional characteristics establish that his statements were involuntary, even though he had been given and had waived his 
Miranda
 rights. Second, Jon argues that the circumstances of his arrest, including the officers’ failure to contact Jon’s parents or a juvenile officer, also establish that Jon’s statements were not voluntary and should have been suppressed.

In reviewing a trial court’s ruling concerning whether a confession is voluntary, the trial court’s factual findings will be reversed only if those findings are against the manifest weight of the evidence. 
In re G.O.
, 191 Ill. 2d 37, 50 (2000). However, a trial court’s ruling on the ultimate question of whether the confession was voluntary is reviewed 
de novo
. 
G.O.
, 191 Ill. 2d at 50.

In determining whether a confession is voluntary, courts look to the totality of the circumstances, including factors such as the party’s age, intelligence, background, experience, education, mental capacity, and physical condition at the time of questioning. 
G.O.
, 191 Ill. 2d at 54. Other factors include the duration and the legality of the detention, the duration of the questioning, as well as any mental or physical abuse by the police, including the existence of threats or promises on the part of the police. 
G.O.
, 191 Ill. 2d at 54. No single factor is dispositive. 
G.O.
, 191 Ill. 2d at 54. The test of voluntariness is whether the individual made his confession freely and voluntarily, without compulsion or inducement of any kind, or whether the individual’s will was overborne at the time of the confession. 
G.O.
, 191 Ill. 2d at 54.

Upon review, we agree with the trial court that the totality of the circumstances indicate that Jon’s confession was voluntary. We first consider Jon’s age, experience, and emotional characteristics. On this point, the record indicates that Jon was an average student with normal reading, writing and verbal skills. Jon was not physically or mentally abused by the police during his interviews, nor did the police make any threats or promises.

Although Dr. Chapman testified that Jon was unable to appreciate the gravity of the situation in waiving his 
Miranda
 rights and was so conditioned to pleasing authority figures that he automatically would answer the officers’ questions, there was ample evidence in the record to the contrary. For example, as the trial court noted, Jon did not hesitate in refusing to answer one of Harberts’ questions concerning Jon’s thoughts of killing others. Similarly, there was evidence that Jon had defied authority figures in the past. Jon had refused to serve his suspension for kissing a girl, and had refused to go to the school in Oklahoma. Keith had told Pastor Davis that Lila was afraid of Jon, and Lila herself told Pastor Bryant that Jon had slammed her hand and had shoved her up against a wall. When Pastor Bryant told Jon not to turn his back on God, Jon told Pastor Bryant that he would commit every sin he wanted to commit. Similarly, when the other students at Park Meadows asked Jon to reconsider serving his suspension, Jon refused, saying he now would do the hurting. In addition, as the trial court noted, Jon “indeed did seem to want to tell what had happened,” both when he first walked up to Spickard at the crime scene and during his interviews with Harberts.

We next consider Jon’s claim that the coercive nature of his encounter with the police establishes that his statements were not voluntary. In support of his claim that Jon’s encounter with the police was coercive, Jon notes that he was handcuffed when he was taken from the crime scene to the police station, in violation of the Lincoln police department’s policy that a juvenile should be handcuffed only when necessary to prevent violence or escape. Likewise, Jon observes that both the Act and the policy of the Lincoln police department state that no minor under 16 years of age may be confined in a jail or a place ordinarily used for the confinement of prisoners in a police station, and that when a minor of appropriate age is detained in a jail cell, he should be told the purpose of his detention, the time it is expected to last, and that the detention cannot exceed six hours. See 705 ILCS 405/5–7(2)(c)(iii), (2)(c)(vi) (West 1994) (repealed by Pub. Act 90–590, art. 2001, §2001–15, eff. January 1, 1999, now 705 ILCS 405/5–410 (West 2000)). Jon argues that, in violation of the Act and the policy, he was detained in a prisoner holding cell and was not told that his detention could not exceed six hours. Finally, Jon notes that he was not advised he could consult with his parents before being questioned, he was not advised that he could be tried as an adult, and Harberts did not make a reasonable attempt to notify Jon’s parents or other person legally responsible for Jon’s care or take Jon to the juvenile officer for jurisdiction, as required under the Act. See 750 ILCS 405/5–6(1) (West 1994).

The trial court found that the violations of the Act did not require suppression of Jon’s statements, as Jon’s waiver of 
Miranda
 was knowingly and intelligently made, and Jon had voluntarily confessed. We agree with the trial court. Although Jon was handcuffed when he first was taken to the police station from the crime scene, Harberts testified that at the time, he thought Jon was 18 or 19 years old. Likewise, although Jon was not told that his detention could not exceed six hours, there is no evidence or allegation that Jon was detained for more than six hours. We do not deem any of these purported violations significant enough to render Jon’s statements coerced or involuntary.

Possibly more significant in this case is the officers’ failure to contact Jon’s parents or a juvenile officer prior to questioning Jon. With regard to the confession of a juvenile, this court has recognized that the taking of such a confession is a “ ‘sensitive concern.’ ” 
G.O.
, 191 Ill. 2d at 54, quoting 
People v. Prude
, 66 Ill. 2d 470, 476 (1977). Consequently, courts considering the voluntariness of juvenile confessions consider whether the juvenile had an opportunity to consult with an adult interested in his welfare, known as a “concerned adult,” either before or during the interrogation. 
G.O.
, 191 Ill. 2d at 55. In determining whether a juvenile had an opportunity to confer with a “concerned adult,” courts consider whether the police prevented the juvenile from conferring with a concerned adult and whether the police frustrated the attempts of a concerned adult to confer with the juvenile. 
G.O.
, 191 Ill. 2d at 55. The “concerned adult” factor is particularly relevant in situations where a juvenile has demonstrated trouble understanding the interrogation process, has asked to speak with either his parents or a concerned adult, or where the police have prevented the juvenile’s parents from speaking with him. 
G.O.
, 191 Ill. 2d at 55. Nonetheless, a juvenile’s confession should not be suppressed simply because he was denied the opportunity to confer with a concerned adult either before or during his interrogation. 
G.O.
, 191 Ill. 2d at 55.

In 
G.O.
, we found that a juvenile’s confession was voluntary even though he was not provided with an opportunity to confer with a concerned adult because: the juvenile never requested to speak with a concerned adult; the police never frustrated an attempt by a concerned adult to speak with the juvenile; the juvenile’s detention was valid; the juvenile was informed of his 
Miranda
 rights and indicated that he understood those rights; the juvenile was intelligent and did well in school; the juvenile was questioned only for a short period of time on three or four occasions; and no coercion or physical threats occurred, nor were any promises made. 
G.O.
, 191 Ill. 2d at 56.

 Based upon the foregoing considerations, we find that any failure to contact Jon’s parents or a juvenile officer prior to questioning Jon did not render his statements involuntary. With regard to Jon’s parents, we note that Jon told Harberts that his grandparents were his legal guardians. As Harberts believed that those legally responsible for Jon’s care were deceased, we do not attribute great weight to the fact that Harberts did not immediately attempt to contact Jon’s parents. In fact, after Harberts had interviewed Jon the first time and obtained information concerning Jon’s mother, Harberts telephoned Glenda.

In addition, as in 
G.O.
, Jon never requested an opportunity to speak with a concerned adult and the officers did not prevent any concerned adult from speaking with Jon. Jon’s detention was valid, and he was informed of his 
Miranda
 rights. Further, although Jon now claims that he did not understand those rights, the trial court found, and we agree, that Jon did understand his 
Miranda
 rights. Pastor Bryant testified that Jon was intelligent and did well in school. Jon was not handcuffed in the jail, and was questioned on only two occasions for approximately 30 minutes each time. 
No physical coercion or threats occurred, and no promises were made. Under the circumstances, we find that the totality of circumstances indicates that Jon’s confession was the result of his own decision and was not the result of compulsion or inducement, nor was Jon’s will being overborne at the time of his confession. For those reasons, we affirm the trial court’s decision denying Jon’s motion to suppress the statements he made while in custody. We now turn to the issues raised in the State’s appeal.

MOTION TO SUPPRESS JON’S INITIAL STATEMENT

In his motion to suppress, Jon also claimed that his initial statement to Detective Harberts at the scene of the crime should be suppressed. As noted above, when Spickard brought Jon over to Harberts, Harberts asked Jon why he had shot the people. Jon responded it was “because they pissed me off. I couldn’t take it anymore so I shot them.” Jon argued that this statement should have been suppressed because he had not been given his 
Miranda
 warnings before Harberts asked the question. The trial court denied Jon’s motion to suppress this statement, finding that the question was an appropriate on-scene general investigative question. The appellate court reversed the trial court, finding that the question was not a general on-scene investigative question, but instead was an interrogation. See 307 Ill. App. 3d at 710 (unpublished material under Supreme Court Rule 23). The appellate court further found that Jon was in custody at the time the question was asked, so that the failure to give 
Miranda
 warnings rendered Jon’s answer to the question inadmissible.

The State appeals the appellate court’s decision with regard to Jon’s initial statement to Detective Harbert. The State maintains that Harberts’ question was not interrogation. The State further argues that, in any event, Jon was not in custody when the question was asked, so that 
Miranda
 warnings were not required.

We need not address whether the appellate court properly found that Harberts’ question was interrogation and that Jon was in custody because we find that, even if the trial court erroneously denied Jon’s motion to suppress his initial statement to Harberts, any error was, at most, harmless. During Jon’s first and second interviews with Harberts, after Jon had received his 
Miranda
 warnings, Jon repeated the initial statement he had made to Harberts at the scene. Specifically, during the second, taped interview, the following exchange took place:

“[Harberts]: OK. Then you walked over to me and [Spickard] told me that you had just walked up and said that you had shot them or killed the, and, uh, you had given him the gun, and I asked you why. Can you tell my [
sic
] why?

[Jon]: Yes sir, I said cause they pissed me off. I was upset and sick and tired of being treated the way I was. I couldn’t take it any longer.”

Even if the initial statement to Harberts had been admitted into evidence erroneously, it is difficult to conceive of any prejudice to Jon when he repeated the statement to Harberts two more times after receiving his 
Miranda
 warnings. Although Jon claimed that any statements he made were coerced because he was conditioned to respond to authority, we find no evidence in the record that Jon’s response to Harberts was not voluntary. It is noteworthy that the response came shortly after Jon of his own initiative confessed to Spickard that he was the shooter. Consequently, the subsequent reading of 
Miranda
 warnings cured the condition that the appellate court found made the initial voluntary but unwarned statement inadmissible. See 
People v. Wilson
, 164 Ill. 2d 436, 452 (1995) (reading of 
Miranda
 warnings cured prior voluntary but unwarned statement), citing 
Oregon v. Elstad
, 470 U.S. 298, 311-12, 84 L. Ed. 2d 222, 233-34, 105 S. Ct. 1285, 1294-95 (1985).

In 
Wilson
, this court held that, once a defendant is warned of his rights, he is free to exercise his own decision of whether to make a second statement. 
Wilson
, 164 Ill. 2d at 452. 
We noted that two hours had passed from the end of the defendant’s first, unwarned statement until he was read his 
Miranda
 warnings, and during that two-hour time period, the defendant was not subject to police interrogation, force, threats, harassment or questioning. 
Wilson
, 164 Ill. 2d at 542.

Here, Jon’s initial statement to Harberts was made shortly after Harberts arrived on the scene at 8:38 p.m. Jon received his 
Miranda
 warnings and was interviewed the first time from 9:05 p.m. until 9:37 p.m., and received the second set of 
Miranda
 warnings and was interviewed the second time from 11:07 p.m. until 11:30 p.m. Jon was not subjected to police interrogation, force, threats or harassment prior to the first interview or between the time of the first and second interviews. Jon was free to make his own decision of whether to repeat his initial statement during the first and second interviews. As those statements, which repeated and in fact enlarged upon Jon’s initial response to Harberts, were admissible, we find that any purported error in admitting Jon’s initial statement to Harberts was harmless.

FELONY MURDER

The State next appeals the appellate court’s finding that Jon could not be found guilty of felony murder based upon the underlying offenses of aggravated battery and aggravated discharge of a firearm. Jon was indicted on eight counts: Counts I and II charged the first degree murders of Lila and Keith, respectively, with intent to kill or do great bodily harm (720 ILCS 5/9–1(a)(1) (West 1994)); counts III and IV charged the first degree murders of Lila and Keith, respectively, by knowingly committing an act causing great probability of death or great bodily harm (720 ILCS 5/9–1(a)(2) (West 1994)); counts V and VI charged the first degree murders of Lila and Keith, respectively, by attempting or committing a forcible felony, namely aggravated battery (720 ILCS 5/9–1(a)(3) (West 1994)); and counts VII and VIII charged the first degree murders of Lila and Keith, respectively, by attempting or committing a forcible felony, namely, aggravated discharge of a firearm (720 ILCS 5/9–1(a)(3) (West 1994)).

Prior to trial, Jon moved to dismiss the counts against him charging felony murder, arguing that felony murder was not appropriate because the predicate felonies, aggravated battery and aggravated discharge of a firearm, were not independent of the murders themselves. The trial court denied the motion to dismiss those counts. On appeal, however, the appellate court concluded that felony murder was limited to cases in which the predicate felony consisted of conduct other than that inherent in the killing itself. 307 Ill. App. 3d at 714. The appellate court therefore held that the trial court had erred in instructing the jury that Jon could be convicted of first degree murder on a felony-murder theory. 307 Ill. App. 3d at 714. However, because Jon was found guilty of first degree murder only with regard to Lila, the appellate court’s finding of reversible error was limited to Jon’s conviction for Lila’s murder.

With regard to felony murder, the Criminal Code of 1961 (the Code) provides:

“(a) A person who kills an individual without lawful justification commits first degree murder if, in performing the acts which cause the death:

* * *

(3) he is attempting or committing a forcible felony other than second degree murder.” 720 ILCS 5/9–1(a)(3) (West 1996).

The Code defines “forcible felony” as, 
inter alia
, “aggravated battery resulting in great bodily harm or permanent disability or disfigurement and any other felony which involves the use or threat of physical force or violence against any individual.” 720 ILCS 5/2–8 (West 1996).

In 1975, this court addressed whether aggravated battery could be the underlying felony in a felony-murder charge where the aggravated battery was alleged to have been committed against the person who eventually died. 
People v. Viser
, 62 Ill. 2d 568, 577 (1975). The defendants in 
Viser
 had claimed that the indictments against them failed to properly charge murder where they alleged that the defendants had each caused the death of the victim, Hector Jordan, as they were attempting to commit or were committing a forcible felony upon Hector Jordan, namely, aggravated battery. 
Viser
, 62 Ill. 2d at 577. The defendants argued that the indictments would have been proper only if the indictments had charged that the defendants killed Hector Jordan while committing an aggravated battery upon the surviving victim, Harold Smith. 
Viser
, 62 Ill. 2d at 578.

Upon review, this court noted that, at common law, any unlawful killing occurring during the commission of any felony was murder. 
Viser
, 62 Ill. 2d at 578. We noted that the Code limited the offense underlying felony murder to “ ‘a forcible felony other than voluntary manslaughter [now second degree murder],’ ” and further noted that aggravated battery is a forcible felony. 
Viser
, 62 Ill. 2d at 578-79, quoting Ill. Rev. Stat. 1973, ch. 38, par. 9–1(a)(3). This court concluded that what the legislature intended in establishing the offense of felony murder “was to deter the commission of any of the enumerated forcible felonies, including aggravated battery, by holding the perpetrator responsible for murder if death results.” 
Viser
, 62 Ill. 2d at 580. Consequently, the indictment charging the defendants with felony murder based upon the aggravated battery of the deceased victim was not improper. 
Viser
, 62 Ill. 2d at 580.

The State argues that the appellate court’s ruling in this case was in direct conflict with our decision in 
People v. Viser
, 62 Ill. 2d 568 (1975). The appellate court acknowledged that its decision might seem inconsistent with the 
Viser
 opinion, but claimed that the court in 
Viser
 did not consider whether the predicate felony underlying a charge of felony murder must have an independent felonious purpose. 307 Ill. App. 3d at 714. The appellate court held that the predicate felony underlying a felony-murder charge must have a felonious purpose other than the killing itself. 307 Ill. App. 3d at 714.

The appellate court was correct that 
Viser
 did not address the precise issue presented in this case. In 
Viser
, the aggravated battery serving as the predicate felony for the felony-murder charge against defendants was based upon an incident where the defendants struck and beat the victim. 
Viser
, 62 Ill. 2d at 576. The victim died two weeks after the beating “of pancreatitis caused by severe abdominal injuries he received” during the beating. 
Viser
, 62 Ill. 2d at 576. The charges of felony murder arose from the cause and effect relationship between the crime committed–aggravated battery–and the resulting murder. See 
People v. Shaw
, 186 Ill. 2d 301, 322 (1998) (“Felony murder depends solely on a cause and effect relationship between the crime committed and the resulting murder to impose liability”).

Here, the cause and effect relationship between the crime committed and the resulting murder is not so clear. The forcible felonies underlying the charges of felony murder in this case–aggravated battery and aggravated discharge of a firearm– were acts that were inherent in, and arose out of, the fatal shootings of Keith and Lila. It is arguable that it was not the predicate felonies which resulted in and caused the murders of Keith and Lila, but rather that it was the murders of Keith and Lila which gave rise to the predicate felonies.

As the appellate court observed, every shooting necessarily encompasses conduct constituting aggravated battery, 
i.e.
, great bodily harm, as well as conduct constituting aggravated discharge of a firearm, 
i.e.
, discharging a firearm in the direction of another. 307 Ill. App. 3d at 712. Potentially, then, all fatal shootings could be charged as felony murder based upon aggravated battery and/or aggravated discharge of a firearm. The result could be to “effectively eliminate the second degree murder statute” and also to “eliminate the need for the State to prove an intentional or knowing killing in most murder cases.” 307 Ill. App. 3d at 712.

Given the foregoing considerations, we agree with the appellate court that where the acts constituting forcible felonies arise from and are inherent in the act of murder itself, those acts cannot serve as predicate felonies for a charge of felony murder. Because the predicate felonies in this case arose from and were inherent in the murders of Keith and Lila, the jury should not have been instructed that Jon could be convicted of first degree murder on a felony-murder theory. Accordingly, we affirm the appellate court’s finding that the trial court erred in instructing the jury on felony murder.

Our inquiry, however, does not end there. The appellate court concluded that the trial court’s error in instructing the jury on felony murder constituted reversible error with regard to Jon’s conviction for the first degree murder of Lila.

We disagree with the appellate court’s conclusion that the error in this case constituted reversible error. In this case, although the jury was instructed that Jon had been charged with two types of first degree murder, knowing or intentional murder (720 ILCS 5/9–1(a)(1), (a)(2) (West 1996)) and felony murder (720 ILCS 5/9–1(a)(3) (West 1996)), only general verdict forms were used at Jon’s trial. The jury received three verdict forms for each victim: (1) not guilty; (2) guilty of first degree murder; and (3) guilty of second degree murder. It is well settled that “ ‘where an indictment contains several counts arising out of a single transaction, and a general verdict is returned[,] the effect is that the defendant is guilty as charged in each count ***.’ ” 
People v. Thompkins
, 121 Ill. 2d 401, 455 (1988), quoting 
People v. Lymore
, 25 Ill. 2d 305, 308 (1962). Thus, a general verdict finding a defendant guilty of murder, where the defendant was charged with intentional, knowing, and felony murder, raises the presumption that the jury found the defendant committed the most serious crime alleged, intentional murder. 
Thompkins
, 121 Ill. 2d at 456. In this case then, we must presume that the jury found Jon guilty of the most serious crime alleged, intentional or knowing murder, so that any error in instructing the jury on felony murder did not deprive Jon of a fair trial. We therefore reverse the trial court’s finding that Jon’s conviction must be reversed and remanded for a new trial.

As a final matter, we note that our presumption that the jury found Jon guilty of intentional or knowing murder rather than felony murder is supported by the fact that the jury found Jon guilty of the second degree murder of Keith Cearlock. As more fully set forth below, second degree murder instructions were given only on the charges of intentional or knowing murder and not on the felony-murder charges. Consequently, in convicting Jon of second degree murder, the jury must have believed Jon was guilty of the intentional or knowing murder of Keith, but that one of the mitigating defenses set forth in the second degree murder statute was present. See 720 ILCS 5/9–2(a)(1), (a)(2) (West 1996). The jury therefore rejected the State’s felony-murder theory as to Keith.

Had the jury believed that Jon was guilty of first degree felony murder with regard to Lila, it would have followed that Jon was guilty of first degree felony murder with regard to Keith. The charges as to both Keith and Lila were identical. The felony-murder charges were based upon the predicate felonies of aggravated battery and aggravated discharge of a firearm, felonies which were inherent in both killings. Thus, if the jury believed that the killing of Lila occurred while Jon was attempting or committing aggravated battery or aggravated discharge of a firearm, it would follow that Jon also killed Keith while attempting or committing aggravated battery or aggravated discharge of a firearm. Because the jury instead found Jon guilty of second degree murder with regard to Keith, we see no reason to disregard the presumption that Jon was found guilty of intentional murder with regard to Lila.

SECOND DEGREE MURDER INSTRUCTIONS

The State next challenges the appellate court’s finding that the trial court erroneously barred second degree murder instructions on the felony-murder counts. Relying on 
People v. Williams
, 164 Ill. App. 3d 99 (1987), and 
People v. Kidd
, 295 Ill. App. 3d 160 (1998), the appellate court held that a defendant is entitled to an instruction on second degree murder where the intent to kill or to use deadly force in a felony-murder case is formed after the formation of his belief in the need for self-defense. 307 Ill. App. 3d at 715-16. The appellate court found that this error constituted reversible error with regard to Jon’s conviction for the first degree murder of Lila.

The State argues that pursuant to the plain language of the second degree murder statute (720 ILCS 5/9–2 (West 1996)), it is clear that second degree murder does not apply to a felony-murder count. The second degree murder statute provides:

“(a) A person commits the offense of second degree murder when he commits the offense of first degree murder as defined in paragraphs (1) or (2) of subsection (a) of Section 9–1 of this Code and either of the following mitigating factors are present:

(1) At the time of the killing he is acting under a sudden and intense passion resulting from serious provocation by the individual killed or another whom the offender endeavors to kill, but he negligently or accidentally causes the death of the individual killed; or

(2) At the time of the killing he believes the circumstances to be such that, if they existed, would justify or exonerate the killing under the principles stated in Article 7 of this Code, but his belief is unreasonable.” 720 ILCS 5/9–2(a) (West 1996).

The State contends that because the second degree murder statute, by definition, does not encompass felony murder, the appellate court committed reversible error when it found that the jury should have been given second degree murder instructions for the felony-murder counts.

In 
Williams
 and in 
Kidd
, the appellate court held that, where provocation occurs prior to the time that a defendant forms a felonious intent or commits an aggravated battery, he is entitled to a jury instruction on second degree murder. 
Kidd
, 295 Ill. App. 3d at 165; 
Williams
, 164 Ill. App. 3d at 110. The court in 
Kidd
 stated that barring a second degree murder instruction in a felony-murder case would effectively eliminate the second degree murder statute in intentional or knowing murder cases. 
Kidd
, 295 Ill. App. 3d at 165. The second degree murder statute would be eliminated because prosecutors that had sufficient evidence to defeat a claim of provocation would charge knowing or intentional murder, while prosecutors that did not have sufficient evidence to defeat a claim of provocation would simply bar that claim by charging a defendant with felony murder. 
Kidd
, 295 Ill. App. 3d at 165-66. The 
Kidd
 court also noted that in 
Viser
, an instruction on the provocation defense was given. 
Kidd
, 295 Ill. App. 3d at 165.

In reversing the trial court’s order denying defendant’s request for a second degree murder instruction on the felony-murder charges, the appellate court in this case held that the trial court had erred in declining to follow the precedent set by the court in 
Williams
 and in 
Kidd
. Because we find the holdings in 
Williams
 and 
Kidd
 to be erroneous, however, we reverse the appellate court’s finding that the trial court should have followed the precedent set forth in those cases and should have given second degree murder instructions on the felony-murder counts.

The primary rule in statutory construction is to ascertain and give effect to the intent of the legislature. 
People v. Hickman
, 163 Ill. 2d 250, 261 (1994). In addition, courts must give the language of a statute its plain and ordinary meaning. 
People v. Tucker
, 167 Ill. 2d 431, 435 (1995).
 Here, the second degree murder statute states that a defendant commits second degree murder when he commits first degree murder as set forth in sections 9–1(a)(1) or (a)(2) of the Code and certain mitigating factors are present. Nowhere does the second degree murder statute reference section 9–1(a)(3) of the Code, felony murder.

In addition, in construing a legislative act, courts should consider each section in connection with other sections. 
Bubb v. Springfield School District 186
, 167 Ill. 2d 372, 382 (1995). Section 9–1(a)(3) of the Code states that a person commits first degree murder if in performing the acts which caused the death, “he is attempting or committing a forcible felony 
other than second degree murder
.” (Emphasis added.) 720 ILCS 5/9–1(a)(3) (West 1996). It would be anomalous, then, to give a second degree murder instruction with regard to a charge of felony murder. Pursuant to the plain language of the statute, it is clear that the provocation defense of second degree murder is not available to a charge of felony murder. Accordingly, we reverse the appellate court’s finding that a second degree murder instruction should have been given on the charges of felony murder, and affirm the trial court’s order declining to give that instruction.

PRIOR VIOLENT CONDUCT

The final argument raised in the State’s appeal is that the appellate court erred when it reversed the trial court’s ruling excluding evidence of prior violent conduct by Keith and Lila Cearlock. Following jury selection, but prior to the commencement of trial, the State moved to exclude testimony by Glenda Ashworth concerning the physical and emotional abuse she suffered as a child from her parents, Keith and Lila Cearlock. In addition, during the testimony of one of Jon’s expert witnesses, Dr. Stuart Hart, the State objected to any testimony concerning Dr. Hart’s interview with Glenda. The trial court sustained the objection, so Jon made an offer of proof concerning Dr. Hart’s testimony. Jon also presented a written offer of proof of Glenda’s testimony.

In the written offer of proof, Glenda indicated that as young as ages four to six, she was beaten with a belt or razor strap. As she grew older, she had to retrieve the razor strap prior to being beaten. In addition, Keith and Lila constantly put Glenda down and referred to her as stupid. Lila spanked Glenda with a belt or with a yardstick or flyswatter. Glenda claimed that when Keith beat her, he beat her with his full strength. Glenda also claimed that Lila pushed Keith into punishing Glenda.

When Glenda was around 13 to 16 years old, Keith broke several yardsticks beating her, and began using boards to beat her. Glenda also said that Keith told her that if she resisted him, he would kill Glenda in her sleep. Glenda believed Keith. Glenda said that when Keith brought Jon to Virginia in March or April 1995, Keith admitted to Glenda that he had been whipping Jon. Glenda asked Jon about the whippings, and Jon told her that everything was all right. Glenda stated that she allowed Jon to live with her parents even though they had abused her because she was looking for her parents’ approval.

In the offer of proof concerning Dr. Hart’s testimony, Dr. Hart testified that he interviewed Glenda over the telephone for approximately 1 hour and 45 minutes to see what Glenda knew about Jon’s experiences with the Cearlocks and to learn about Jon’s early development and experiences with Glenda and about Glenda’s experiences as the Cearlocks’ child. Glenda told Dr. Hart that, as a child, she experienced physical and psychological mistreatment by the Cearlocks which brought her to the point of considering suicide. Dr. Hart testified that Glenda described a repetitive and persistent pattern of frequent beatings with a belt, of repeated criticism, and of battling between Keith and Lila.

Dr. Hart agreed that he had to consider the passage of time and that changes may occur within people or families, but he did not believe any substantial changes had occurred in the Cearlock home. Dr. Hart found it significant that the experiences described by Jon were very similar to Glenda’s experiences as a child. On cross-examination, Dr. Hart testified that he had never contacted or spoken with Glenda’s brother Doug in order to corroborate her statements about her childhood.

In ruling on the offer of proof concerning Glenda’s testimony, the trial court considered the fact that there was a period of 20 to 25 years between the abuse allegedly suffered by Glenda and the abuse to which Jon testified. In addition, the trial court stated that there was no one that could rebut the testimony set forth in Glenda’s offer of proof. The trial court also stated, “this court, anyway, does not have the indicia of reliability that the court believes it should have.” The trial court declined to find a nexus between Glenda’s testimony concerning events of 25 years ago and Jon’s testimony of events in the past couple years, and therefore denied the offer of proof. The trial court also held that Jon could not directly or indirectly bring in Glenda’s testimony through the testimony of Dr. Hart. After Jon made his offer of proof concerning Dr. Hart’s testimony, the trial court stated the offer contained “nothing the Court hasn’t heard before,” and denied the offer of proof.

On appeal, the appellate court held that it was error for the trial court to exclude the evidence presented in the offers of proof. See 307 Ill. App. 3d at 710 (unpublished material under Supreme Court Rule 23). The appellate court, citing 
People v. Lynch
, 104 Ill. 2d 194, 199-201 (1984), observed that where a theory of self-defense is raised, evidence of a victim’s violent or aggressive character is relevant (1) to show that the defendant’s knowledge of the victim’s behavior and tendencies affected the defendant’s perceptions of and reactions to the victim’s actions, and (2) to support the defendant’s version of events where there are conflicting accounts. Despite its citation to 
Lynch
, the appellate court then stated that the testimony of Glenda and Dr. Hart was not offered for either of the two purposes permitted by 
Lynch
, but instead was offered to corroborate Jon’s account of his life in the Cearlock home. See 307 Ill. App. 3d at 710 (unpublished material under Supreme Court Rule 23).

Relying on 
People v. Robinson
, 163 Ill. App. 3d 754 (1987), the appellate court held that Glenda’s corroborative testimony was admissible. The appellate court also stated that Jon’s lack of knowledge concerning his mother’s childhood experiences had no bearing on the purpose for which her testimony was offered. Likewise, the appellate court held that Dr. Hart’s testimony should have been admitted to explain his reliance on the family history provided by Glenda. In support of its finding, the appellate court noted that an expert witness may base his opinion on information that has not been admitted into evidence. The appellate court further concluded that the error was harmless with respect to the verdict of second degree murder as to Keith, but was prejudicial error with regard to the verdict of first degree murder as to Lila.

It is within the trial court’s discretion to decide whether evidence is relevant and admissible. 
People v. Hayes
, 139 Ill. 2d 89, 130 (1990). A trial court’s decision concerning whether evidence is relevant and admissible will not be reversed absent a clear abuse of discretion. 
Hayes
, 139 Ill. 2d at 130. An abuse of discretion will be found only where the trial court’s decision is “ ‘ “arbitrary, fanciful or unreasonable” ’ ” or where no reasonable man would take the trial court’s view. 
People v. Illgen
, 145 Ill. 2d 353, 364 (1991), quoting 
People v. M.D.
, 101 Ill. 2d 73, 90 (1984), quoting 
Peek v. United States
, 321 F.2d 934, 942 (9th Cir. 1963). Evidence is considered relevant if it has any tendency to make the existence of any fact that is of consequence to the determination of an action either more or less probable than it would be without the evidence. 
Illgen
, 145 Ill. 2d at 365-66. However, a trial court may reject evidence on the grounds of relevancy if the evidence is remote, uncertain or speculative. 
People v. Cloutier
, 156 Ill. 2d 483, 501 (1993).

For the reasons that follow, we cannot conclude that the trial court’s ruling excluding the proffered testimony was so arbitrary, fanciful or unreasonable that no reasonable man would take the view adopted by the trial court. In so holding, we find the appellate court’s reliance on 
People v. Robinson
, 163 Ill. App. 3d 754 (1987), to be misplaced.

In 
Robinson
, the court held that, where a theory of self-defense is raised, a victim’s violent and aggressive character is relevant to show who was the aggressor. 
Robinson
, 163 Ill. App. 3d at 772. The 
Robinson
 court noted that it generally is a defendant’s right to present evidence of a victim’s character for violence when the defendant alleges that he acted in self-defense against the victim, because such evidence tends to show circumstances confronting the defendant, the extent of the defendant’s apparent danger, and the motive influencing the defendant. 
Robinson
, 163 Ill. App. 3d at 773. Accordingly, the defendant in 
Robinson
 should have been permitted to introduce evidence of prior threats and violence by the victim against the defendant, even where the victim was killed when the defendant and a third man struggled over a shotgun. 
Robinson
, 163 Ill. App. 3d at 774.

Here, in contrast to 
Robinson
, Jon was allowed to testify concerning his grandparents’ aggressive and violent character. Jon also testified concerning how his knowledge of that violent and aggressive character affected his perceptions of and reactions to his grandparents’ behavior after he fired the gun at the Tilex bottle. Jon claimed that when he saw Keith coming toward him, he thought Keith was going to beat him to death, and shot Keith “[s]o he couldn’t get to me.” Jon further claimed that he shot Lila because “[s]he was just as dangerous as my grandpa” and because Keith would never beat Jon without Lila forcing him into it. 
The trial jury apparently found Jon to be credible, as the jury found Jon guilty of second degree murder with respect to Keith.

Although the appellate court claimed that the testimony of Glenda and Dr. Hart was not offered for either of the two purposes permitted by 
Lynch
, the testimony clearly was offered to corroborate Jon’s claim of self-defense
. With that in mind, we fail to see how Glenda’s testimony concerning her childhood many years earlier was relevant to Jon’s claim of self-defense. Under 
Lynch
, one of the purposes for which the Cearlocks’ violent and aggressive character could be introduced was to show how Jon’s knowledge of their character affected his perceptions and reactions. Because there was no testimony that Jon was aware of his mother’s childhood experiences, however, testimony concerning Glenda’s childhood could not have affected J
on’s perceptions and reactions.

Likewise, the other purpose for which evidence of a victim’s propensity for violence can be admitted under 
Lynch
 is to support a defendant’s version of events where there are conflicting accounts of what happened. Here, too, the account of Glenda’s childhood was not relevant to Jon’s claim of self-defense because there were no conflicting accounts of what had happened. In fact, all accounts of what had happened were based upon Jon’s statements and testimony.

As noted, relevant evidence must have a tendency to make the existence of any fact that is of consequence to the determination of an action either more or less probable than it would be without the evidence. 
We agree with the trial court that any nexus between testimony concerning Glenda’s childhood and Jon’s claim of self-defense was remote at best. Indeed, with regard to Lila, we fail to see how the information concerning Glenda’s childhood was relevant at all.

When Lila saw Jon with the gun, she screamed and began to run out of the house, at which point Jon shot her in the back. Jon then followed Lila as she made it out of the house, and attempted to shoot her some more when she fell face forward into the grass, but his gun jammed. Jon then went inside the house to look for Lila’s gun, so that he could go back outside and continue shooting her. We find no nexus between Glenda’s childhood and Jon’s pursuit of a fleeing Lila. Even if Jon feared Lila because she goaded Keith into beating Jon, that threat had been removed when Keith was shot first.

Under the circumstances, we disagree with the appellate court that the testimony of Glenda and Dr. Hart should have been admitted to corroborate Jon’s account of life in the Cearlock home. Consequently, we reverse the appellate court’s finding that it was prejudicial error to exclude the evidence set forth in Jon’s offers of proof, and affirm the trial court’s ruling excluding the evidence.

CONCLUSION

For the foregoing reasons, we disagree with the appellate court’s holding that the trial court had committed reversible error in denying Jon’s motion to suppress his initial statement to Harberts. We agree with the appellate court’s holding that the predicate felony underlying a charge of felony murder must have an independent felonious purpose, but disagree with the appellate court’s holding that Jon’s conviction for the first degree murder of Lila must be reversed due to the trial court’s error in denying Jon’s motion to dismiss the felony-murder counts and in instructing the jury on felony murder. We also disagree with the appellate court’s holding that the trial court should have given second degree murder instructions on the counts of felony murder. Finally, we disagree with the appellate court’s holding that the testimony set forth in Jon’s offers of proof should have been admitted at trial. We agree with the appellate court’s holding that Jon was properly transferred from juvenile court and that the trial court properly denied Jon’s motion to suppress statements he made while in police custody.

For the reasons stated, the judgment of the appellate court is affirmed in part and reversed in part, and the judgment of the circuit court is affirmed.

Appellate court judgment affirmed

in part and reversed in part;

circuit court judgment affirmed.

JUSTICE GARMAN took no part in the consideration or decision of this case.

JUSTICE FREEMAN, dissenting:

I respectfully dissent from the opinion of the court. Unlike my colleagues, I believe that the circuit court erred in denying defendant’s motion to suppress the statements he made while in police custody. 

The totality of the circumstances surrounding a confession is to be considered in the determination of whether a juvenile confessed to a crime following a knowing and voluntary waiver of his 
Miranda
 rights. 
Fare v. Michael C.
, 442 U.S. 707, 724-25, 61 L. Ed. 2d 197, 212, 99 S. Ct. 2560, 2571-72 (1979). Factors to consider include the juvenile’s age, intelligence, background, experience, mental capacity, education, and physical condition at the time of the questioning. 
In re G.O.
, 191 Ill. 2d 37, 54 (2000). Other factors also include the legality and duration of the detention, the duration of the questioning, and any physical or mental abuse by police such as threats or promises. 
In re G.O.
, 191 Ill. 2d at 54. This court has held that the test for voluntariness is whether the juvenile “ ‘made the statement freely, voluntarily, and without compulsion or inducement of any sort, or whether the [juvenile’s] will was overcome at the time he or she confessed.’ ” 
In re G.O.
, 191 Ill. 2d at 54, quoting 
People v. Gilliam
, 172 Ill. 2d 484, 500 (1996). Critically, this court has been mindful of the fact that “the taking of a juvenile’s confession is ‘a sensitive concern.’ ” 
In re G.O.
, 191 Ill. 2d at 54, quoting 
People v. Prude
, 66 Ill. 2d 470, 476 (1977). We have noted that the “ ‘greatest care’ ” must be used in order to assure that the confession was not coerced or suggested and that “ ‘it was not the product of ignorance of rights or of adolescent fantasy, fright or despair.’ ” 
People v. Simmons
, 60 Ill. 2d 173, 180 (1975), quoting 
In re Gault
, 387 U.S. 1, 55, 18 L. Ed. 2d 527, 561, 87 S. Ct. 1428, 1458 (1967). As we explained in 
In re G.O.
, this specialized concern has led this court to include another factor in the inquiry, 
i.e.
, whether the juvenile, either before or during the interrogation, had an opportunity to consult with an adult interested in his welfare. 
In re G.O.
, 191 Ill. 2d at 54-55. This factor also includes whether the police prevented the juvenile from conferring with a concerned adult and whether the police frustrated the parents’ attempt to confer with the juvenile. 
In re G.O.
, 191 Ill. 2d at 55.

The court today lists the factors that lead it to conclude that the circuit court correctly denied defendant’s motion to suppress. First among these are the defendant’s age, experience, and emotional characteristics. Slip op. at 24. The court finds significant the fact that defendant was of average intelligence, with normal reading, writing, and verbal skills. Slip op. at 24. In my view, however, the record contains evidence which does not support the court’s conclusion.

Defendant was 14 years of age at the time of his arrest. He had no prior experience with the legal system or with police interrogation. The record reveals that defendant’s only brush with the law came when he and another youth were caught trespassing on private property by a police officer. Defendant was not arrested but, instead, was warned by the officer and told to go home. Such an interaction can hardly be deemed as “experience” that would prepare a juvenile for the complexities of a double murder investigation interrogation.

As for defendant’s emotional characteristics, the court’s opinion is devoid of any details with respect to this factor. I find this lack of detail troubling in light of the evidence contained in the record pertaining to defendant’ emotional health. According to the testimony, defendant was treated for psychiatric problems at the time he entered kindergarten. Defendant’s problems, discovered when he was five years old, eventually required hospitalization at the Psychiatric Institute of Richmond. Defendant was treated with antidepressants and was later discharged when he was no longer considered a danger to himself or others. Defendant was readmitted to the same psychiatric institute later when the problems continued. The reason for the readmission was aggression, academic deterioration, and suicidal tendencies. Defendant was ultimately diagnosed with major depression and attention deficit disorder. These conditions were treated successfully with medication.

The record reveals, however, that when defendant’s mother sent defendant to live with the victims, the course of defendant’s psychiatric treatment changed, and the medicine, which had controlled defendant’s condition, was discontinued. Defendant was enrolled at Park Meadows Baptist Church and Academy. According to the principle of the academy, when defendant was disciplined, he would acknowledge his wrongdoing and accept his punishment. Defendant appeared to accept the discipline without any signs of outward rebellion. Dr. Chapman, who interviewed defendant to determine his fitness to stand trial, testified that defendant lacked the ability to appreciate the gravity of the situation when he waived his 
Miranda
 rights. Dr. Chapman stated that defendant’s behavior with the authorities the night of his arrest was consistent with his past behavior of trying to please authority figures. In light of these facts, I cannot agree that the evidence supports the conclusion that defendant’s age, experience, and emotional characteristics weigh in favor of the finding of a voluntary and knowing confession. Contrary to the court’s view, these factors should weigh in favor of suppressing the confession.

The court next notes that although defendant was handcuffed when he was first taken to the police station from the crime scene, in violation of Lincoln police policy, this fact is not relevant because Detective Harberts testified that, at the time, he believed defendant to be 18 or 19 years old. Although the court does not consider this fact “significant enough” to render defendant’s statements coerced or involuntary (slip op. at 25), I disagree. The record contains several photographs that depict defendant at the time of his arrest. The photographs, in my view, tend to show a young boy of high school age. Given the fact that the victims in this case were known by police to have been defendant’s grandparents, I cannot conceive of a police officer not ascertaining whether the alleged perpetrator in his custody was a juvenile. This fact, in conjunction with the officer’s failure to contact defendant’s parents or a juvenile officer prior to questioning, raises a serious question as to whether the police that night were as mindful of the fact that “the taking of a juvenile’s confession” is as “ ‘sensitive [a] concern’ ” as this court has deemed it to be. 
In re G.O.
, 191 Ill. 2d at 54, quoting 
People v. Prude
, 66 Ill. 2d 470, 476 (1977).

In this case, when Harberts discovered that defendant was only 14 years old, he called the Logan County State’s Attorney for advice. The State’s Attorney’s merely advised Harberts to make sure that defendant received his 
Miranda
 rights and to find out if the victims were his guardians. Harberts began his interrogation shortly after 9 p.m. At that time, Harberts did not tell defendant that he could consult with his parents, nor did he advise defendant that he could be tried as an adult. Harberts waited until 1 to 1½ hours later to attempt to call defendant’s mother. When he finally did telephone defendant’s mother, he received only an answering machine, on which he left a short message stating only his name and that defendant was with him and there was an emergency. When defendant’s mother returned the call, she advised Harberts that defendant suffered from attention deficit disorder and that she wanted defendant to be provided with a lawyer. This request was not complied with. Moreover, Harberts did not advise defendant that he could call the city of Lincoln’s juvenile officer.
(footnote: 1)  The behavior of Harberts certainly suggests that the “ ‘greatest care’ ” might not have been used to assure that the confession was not coerced or suggested and that “ ‘it was not the product of ignorance of rights or of adolescent fantasy, fright or despair.’ ” 
People v. Simmons
, 60 Ill. 2d 173, 180 (1975), quoting 
In re Gault
, 387 U.S. 1, 55, 18 L. Ed. 2d 527, 561, 87 S. Ct. 1428, 1458 (1967). This is yet another factor that should weigh in favor of suppressing the confession.

The foregoing facts, viewed under the totality of the circumstances, compel me to conclude that defendant’s statement should have been suppressed. As the United States Supreme Court has recognized:

“[A] 14-year-old boy, no matter how sophisticated, is unlikely to have any conception of what will confront him when he is made accessible only to the police. That is to say, we deal with a person who is not equal to the police in knowledge and understanding of the consequences of the questions and answers being recorded and who is unable to know how to protect his own interests or how to get the benefits of his constitutional rights.” 
Gallegos v. Colorado
, 370 U.S. 49, 54, 8 L. Ed. 2d 325, 328, 82 S. Ct. 1209, 1212 (1962).

In this case, defendant’s age, experience, and the lack of a concerned adult’s presence, not to mention the evidence of record concerning defendant’s mental characteristics, raise a genuine doubt whether the confession which ensued was the product of free will. For this reason, I disagree with the court’s conclusion that the circuit court did not err in denying defendant’s motion to suppress.

Given my position on the issue of the admissibility of defendant’s confession, I could end this dissent here. However, I wish to also point out my disagreement with the court’s conclusion that the circuit court’s error in instructing the jury on felony murder does not constitute reversible error with regard to defendant’s conviction for the first degree murder of Lila. See slip op. at 32. The court bases this conclusion on the fact that the jury’s return of the general verdict raises a presumption that the jury found defendant guilty of the most serious crime charged, which, in this case, would be intentional murder. See slip op. at 33.

I assume that when the court states that the error does not constitute reversible error (slip op. at 32), the court means that any error which occurred in this case was harmless. However, the court’s harmless error analysis fails to consider that the prosecutor in this case argued repeatedly to the jury that it should first consider the felony murder theory because, if the jury found the underlying felony proved, then it need not deal with the considerable amount of evidence relating to defendant’s mental state. Given the State’s argument, I believe that the court’s reliance on the presumption is inappropriate. The State’s argument demonstrates that the erroneous instruction may have played a part in the jury’s decision to convict defendant of first, as opposed to second, degree murder. In this respect, I agree with the conclusions reached by the appellate court with respect to this issue:

“The State *** presented general verdict forms, which obscure the basis for the jury’s verdict, and repeatedly encouraged the jury to deal only with the felony murder counts and to disregard evidence of [defendant’s] mental state. ***

***In this case, the prosecutor succeeded in diluting the intent requirement for knowing or intentional murder by charging felony murder and, as a result, [defendant] was denied a fair trial.” 
People v. Morgan
, 307 Ill. App. 3d 707, 717 (1999).

For this reason, I disagree with the court’s conclusion that the error in this case was not “reversible error.”

JUSTICE McMORROW joins in this dissent.

FOOTNOTES
1:     
1
The record reveals that a member of the Lincoln police department eventually telephoned the youth officer, Sergeant Sisk at 10:30 p.m. Sisk, who was at home sleeping, was asked if he knew the defendant. He stated that he did not know “this kid” and went back to bed. Sisk was not told by the officer that the “kid” in question had been arrested in the shooting deaths of two people and was currently in custody. This evidence hardly establishes confidence in the way in which law enforcement officials attempted to protect this juvenile’s rights.